UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

YULY ARONSON,                                    :         Case No.: 07 CIV 9405
                                                 :         (KMK)
                          Plaintiff,             :
-against-                                        :         **MEMORANDUM OF LAW**
                                                 :
                                                 :
ANTHONY BRANCA,                                  :
                                                 :
                          Defendant.             :

------------------------------------------------------------x

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CIVIL CONTEMPT

Plaintiff's Motion for Civil Contempt arises out of a violation of this Court's Temporary Restraining Order ("TRO") that is now a Preliminary Injunction. *Defendant admitted at his deposition that he sold property in violation of the order.*

## I. Relevant Facts and Procedural History

The lawsuit at bar is for damages and equitable relief that arose from Defendant's alleged fraud and related unlawful conduct pertaining to business relationships between the parties. A copy of the Complaint is attached as **Exhibit A**. One of the companies at issue is Windward Holdings Corp. ("Windward"). On November 28, 2007, the Plaintiff obtained a TRO pursuant to FRCP 65(b). The TRO states in relevant part that:

> **After hearing and consideration, it is Ordered that, or further order of this court [*sic*], the Defendant is preliminarily enjoined from the <u>sale</u>, conveyance, transfer, encumbrance or pledging as collateral the following:**
>
> **[…] <u>property held by or in the name of Windward Holdings Corp.</u> […]**

(emphasis added) *See*, TRO dated November 28, 2008; appended hereto as **Exhibit B.**

Of note, the foregoing TRO was thereafter extended by subsequent orders (appended to Ex. B) and modified to become a Preliminary Injunction by Stipulation, *So Ordered* July 18, 2008, appended hereto as **Exhibit C.**

In the interim, on July 7, 2008, the Defendant's Examination Before Trial ("EBT") was taken at which time he was represented by counsel (Peter Goodrich, Esq.). A copy of the Transcript is appended as **Exhibit D.**

Pertaining to Windward, therein Defendant disclosed that in April 2008 Defendant violated the TRO by selling Windward's property located at 38 Seneca Street (*a/k/a* Seneca Walk), Ocean Bay Park, NY (the "Windward Property") without permission of this Court (or Plaintiff). Further, there has been no accounting or showing that the sale of the Windward Property was for valuable or proper consideration; the proceeds are missing too.

At the EBT and under oath, in response to the following questions by Plaintiff's Counsel (Brian Reis, Esq.), Defendant gave the following answers:

Q. What properties did Windward Holdings Corp. own, Mr. Branca?

A. Windward holdings Corp. owns a Fire Island house, it owns a piece of land down in Florida and 700 Sommer Street. <u>Transcript, pg. 11, lines 11-15</u>.

[…]

**Q. I just have one more question, Mr. Branca, for today. I just want to clarify one thing. 38 Seneca Walk was just sold in April?**

**A. Correct. 2008.**

**Q. Was that a property that was held by Windward Holdings?**

**A.    Yes.**

[...]

Q. The TRO directed that no properties of Windward Holdings be sold, encumbered or pledged.

A.  No it didn't, sir. It said none of the properties that belonged to Yuly Aronson or that Yuly Aronson claimed an interest in could be sold.  If you take your shareholder agreement, it clearly states the 38 Seneca was not part of that deal.

MR. REIS: I have no further questions for you. Thank you. <u>Transcript, pg. 114, line 20 – pg. 145, line 15</u>.

## II. Argument

The Defendant's above-described actions were plainly in civil contempt of this Court's TRO despite incredulous protestation to the contrary. There is clear and convincing evidence that Defendant, by the above-described sale of the Windward Property, did not diligently attempt to comply and thereby violated the clear and unambiguous order of the Court.

**A. Civil Contempt has three (3) elements all of which have been proven by clear and convincing evidence.**

To find Civil Contempt, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. <u>King v. Allied Vision Ltd., 65 F.3d 1051, 1058 (2d Cir.1995)</u> (elements of civil contempt). The Plaintiff at bar has established all of the elements.

3

**1. The Order is clear and unambiguous**.

A clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114, 116 (2d Cir.1988), who "must be able to ascertain from the four corners of the order precisely what acts are forbidden." *See,* Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n, 889 F.2d 389, 395 (2d Cir.1989), cert. denied, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990). In the case at bar, the Court left no room for error or misinterpretation in its Order. The sale, conveyance, transfer, encumbrance or pledging as collateral of Windward Assets were all expressly prohibited. **Ex. B**.

**2. The proof of noncompliance is clear and convincing**.

Defendant's admissions under oath are direct evidence of the non-compliance. See FRE 804 (b)(3) Statement Against Interest. Moreover, pursuant to Rule 1007, "[c]ontents of things may be proved by the testimony or deposition of the party against whom offered or by that party's written admission, without accounting for the nonproduction of the original." As such, the Court may use the deposition transcript provided (Ex. D) as evidence in chief without the need for the undersigned to produce the original deposition transcript.

**3. The contemnor has not diligently attempted to comply in a reasonable manner.**

In the case at bar contemnor is the Defendant. His self-serving testimony that the Windward Property was not part of the TRO is absurd. Defendant shows that he either (i) did not even read the plain language of the TRO, or (ii) ignored the obvious language for his advantage.

As such, Defendant was far from reasonably diligent. Rather, his conduct was a flagrant disregard of the clear Order.  Thus, the third prong for civil contempt vis a vis King, *supra*, has been satisfied as well.

**B. The violation is continuing.**

In addition to the illegal sale, which violated the TRO, Defendant has neither provided details (*e.g.*, sales contract, date of sale, etc.) nor accounted for the proceeds of the transaction. Since Defendant is still acting in violation of the order, now a preliminary injunction, by his secrecy and wasting of assets, *remedial sanctions* are necessary and proper to bring him into compliance. *See*, Objective Solutions Intern., Ltd. v. Gammon  2008 WL 538445 pg. 3, S.D.N.Y. 2008, *citing* Paramedics Electromedia Comercial, Ltda. v. GE Med. Sys. Info Tech., Inc., 369 F.3d 645, 657 (2d Cir.2004); Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 673 F.2d 53, 56 (2d. Cir.1982).

## II. Conclusion

Defendant by admission violated the TRO and has failed to account. As such, he must be held in civil contempt. Accordingly, Plaintiff should be awarded return of the Windward Property and/or such security necessary to restore the Windward assets to their prior status and value, along with  reasonable attorney's fees and costs for this motion, and for such relief deemed appropriate in the discretion of the Court.

Dated: August 8, 2008
        New York, NY

                        Respectfully,

                        _____
                        Andrew Small, Esq. (AS-1294)
                        Law Office of Brian Reis, Esq.
                        80 Broad St. 33rd Fl.
                        New York, NY 10004
                        Direct Tel. 212.983.0921
                        Direct Fax: 212.656.1037
                        Email: abslawyer@comcast.net


To:     **Attorney for Defendant**
        Peter Goodrich, Esq.
        Goodrich & Bendish
        399 Knollwood Road, Ste. 303
        White Plains, NY 10603

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

YULY ARONSON                               :
                                           :   COMPLAINT
                                           :
                                           :
            Plaintiff,                     :   Index No. 07 CIV 9405
                                           :   Assigned to Judge McMahon
      - Against -                          :
                                           :
ANTHONY BRANCA,                            :
                                           :
            Defendant.                     :
                                           :
                                           :
                                           :
-----------------------------------------------------------x

## NATURE OF THIS ACTION

1.      This is a proceeding to recover losses sustained by Plaintiff due to the

fraudulent actions of Defendant in his capacity   (1) as a Certified Public Account

("CPA") retained by Plaintiff and entities in which Plaintiff held and holds interests and

(2) as a fellow shareholder and Member of entities in which Plaintiff was and is a

shareholder and Member.  Simply stated, Defendant utilized his position as a CPA and

shareholder and Member to defraud and embezzle monies and property in which Plaintiff

held an interest, by forging the signature of Plaintiff on checks made payable to

Defendant, and by submitting false expense invoices to Plaintiff and the entities in which

Plaintiff held and holds an interest, in order to obtain wrongfully payments to Defendant.

In addition, upon information and belief, Defendant has wrongfully conveyed property

interests of Plaintiff to himself by forging the signature of Plaintiff on corporate

documents.   As a result, Plaintiff has been damaged in excess of $750,000.

**THE PARTIES and JURISDICTION**

2.    Plaintiff is an individual who resides in Connecticut.

3.    Upon information and belief, Defendant is an individual who resides in Bedford, NY.

4.    Diversity jurisdiction of this Court is founded upon 28 U.S.C. § 1332 as Plaintiff is a citizen of the state of Connecticut and the Defendant is a citizen of New York and the matter in controversy exceeds Seventy Five Thousand Dollars ($75,000) exclusive of interest and costs.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a) (3), because a substantial number of the events or omissions giving rise to the claims herein occurred within this District or were committed here, and pursuant to 28 U.S.C. § 1391 (a) (1) and (3) because the Defendant resides in this judicial district and is subject to personal jurisdiction here.

ALLEGATIONS and FACTS

6.    Plaintiff was and is the sole shareholder in May Construction Co., Inc ("May Construction") a  New York corporation.

7.    Defendant is a CPA and Plaintiff retained the services of Defendant in his capacity as a CPA on behalf of May Construction during the period of 1994 through the present.

8.    As a result of concern by Plaintiff that funds in the account of May Construction were being misappropriated, Plaintiff began to review random checks of May Construction and learned that Defendant  had forged the  signature of Plaintiff on checks  made payable to  Defendant.

2

9.      Plaintiff also became aware through the random review of checks, that Defendant had negotiated checks in amounts that had no correlation to work performed by Defendant in his capacity as a CPA.

10.      Plaintiff and Defendant were also shareholders in an entity known as Windward Holdings, Corp. ("Windward Holdings") and fellow members of an entity known as Bearhill, LLC ("Bearhill").

11.      As part of his contribution as a shareholder of Windward Holdings, LLC and a Member of Bearhill, Defendant acted in his capacity as a CPA and maintained the books and records of those entities.

12.      Defendant has submitted documents to Plaintiff regarding the alleged expenses and payment of expenses relating to Windward Holdings, LLC and these documents evidence the misappropriation of funds by Defendant.

13.      Defendant has also submitted documents to Plaintiff regarding the alleged expenses and payment of expenses relating to Bearhill and these documents evidence the misappropriation of funds by Defendant.

14.      In addition, upon information and belief, Defendant has wrongfully conveyed property interests of Plaintiff to himself by forging the signature of Plaintiff on corporate documents.


## -AS AND FOR A FIRST CAUSE OF ACTION-

15.      Plaintiff repeats and realleges ¶'s 1- 14 as if fully set forth herein.

3

16.     In his capacity as the CPA to May Construction, the entity owned by Plaintiff, Defendant owed a fiduciary duty to perform his accounting duties professionally and ethically.

17.     The known forgeries by Defendant which resulted in payments to Defendant and his accounting firm through the account of May Construction, is a breach of the fiduciary duty owed to Plaintiff.

18.     Upon information and belief, Defendant engaged in additional acts of forgery and wrongful payments to himself and to his accounting firm through the account of May Construction, and those actions are also in breach of the fiduciary duty owed to Plaintiff.

19.     Plaintiff has sustained damages in excess of $75,000 as a result of the breach of fiduciary duty by Defendant.

20.     Plaintiff requests Judgment in an amount in excess of $75,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.

### -AS AND FOR A SECOND CAUSE OF ACTION-

21.     Plaintiff repeats and realleges ¶'s 1- 20 as if fully set forth herein.

22.     As part of his contribution as a shareholder of Windward Holdings, LLC, Defendant acted in his capacity as a CPA and maintained the books and records of that entity. In his capacity as the CPA to Windward Holdings, Defendant owed a fiduciary duty to plaintiff to perform his accounting duties professionally and ethically.

22.     By submitting false invoices to Plaintiff in order to obtain payments from Plaintiff, the Defendant is in a breach of the fiduciary duty owed to Plaintiff.

4

23.      Plaintiff has sustained damages in excess of $20,000 as a result of the breach of fiduciary duty by Defendant.

24.      Plaintiff requests Judgment in an amount in excess of $20,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.

### -AS AND FOR A THIRD CAUSE OF ACTION-

25.      Plaintiff repeats and realleges ¶'s 1- 24 as if fully set forth herein.

26.      As part of his contribution as a Member of Bearhill, Defendant acted in his capacity as a CPA and maintained the books and records of that entity In his capacity as the CPA to Bearhill, Defendant owed a fiduciary duty to plaintiff and Bearhill to perform his accounting duties professionally and ethically.

27.    By submitting false  invoices to Plaintiff in order to obtain payments from Plaintiff the Defendant is a breach of the fiduciary duty owed to Plaintiff.

28.      Plaintiff has sustained damages in excess of $20,000 as a result of the breach of fiduciary duty by Defendant.

29.      Plaintiff requests Judgment in an amount in excess of $20,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.


### -AS AND FOR A FOURTH CAUSE OF ACTION-

30.      Plaintiff repeats and realleges ¶'s 1- 29 as if fully set forth herein.

5

31.     Through his retention as a CPA to May Construction, the entity owned solely be Plaintiff, Defendant had a contractual obligation to Plaintiff to perform his accounting duties professionally and ethically.

32.     The known forgeries and payments by Defendant and his accounting firm through the account of May Construction, is a breach contract.

33.     Upon information and belief, Defendant engaged in additional acts of forgery and wrongful payments to himself and to his accounting firm through the account of May Construction, and those actions are also a breach of contract.

34.     Plaintiff has sustained damages in excess of $20,000 as a result of the breach of contract by Defendant.

35.     Plaintiff requests Judgment in an amount in excess of $20,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.

## -AS AND FOR A FIFTH CAUSE OF ACTION-

36.     Plaintiff repeats and realleges ¶'s 1- 35 as if fully set forth herein.

37.     As part of his contribution as a shareholder of Windward Holdings, LLC, Defendant acted in his capacity as a CPA and maintained the books and records of that entity. Through his retention as a CPA to Windward Holdings, Defendant had a contractual obligation to Plaintiff to perform his accounting duties professionally and ethically.

38.     By submitting false vendor to Plaintiff in order to obtain payments from Plaintiff the Defendant is in a breach of contract.

6

39.    Plaintiff has sustained damages in excess of $20,000 as a result of the breach of contract by Defendant.

40.    Plaintiff requests Judgment in an amount in excess of $20,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.

### -AS AND FOR A SIXTH CAUSE OF ACTION-

41.    Plaintiff repeats and realleges ¶'s 1- 40 as if fully set forth herein.

42.    As part of his contribution as a  Member of Bearhill, Defendant acted in his capacity as a CPA and maintained the books and records of that entity.    Through his retention as a CPA to Bearhill, Defendant had a contractual obligation to Plaintiff to perform his accounting duties professionally and ethically.

43.    By submitting false invoices to Plaintiff in order to obtain payments from Plaintiff the Defendant is in a breach of contract.

44.    Plaintiff has sustained damages in excess of $20,000 as a result of the breach of contract by Defendant.

45.    Plaintiff requests Judgment in an amount in excess of $20,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.


### -AS AND FOR A SEVENTH CAUSE OF ACTION-

46.    Plaintiff repeats and realleges ¶'s 1- 46 as if fully set forth herein.

7

47.    Upon information and belief, Defendant has wrongfully conveyed property interests of Plaintiff to himself by forging the signature of Plaintiff on corporate documents.

47.    Specifically, Defendant forged the signature of Plaintiff on a document titled "Windward Holdings Corp. Amendment to Shareholders Agreement" which states, inter alia, that Plaintiff sold his shares of Windward Holding to Defendant for ten dollars on about June 1, 2005.

48.    Plaintiff did not sign said document.

49.    Upon information and belief, Defendant has wrongfully conveyed assets to himself that were held by Windward Holdings, to which Plaintiff has an interest.

50.    Upon information and belief, as a result of the wrongful conveyance, Plaintiff has sustained damages in an amount in excess of $400,000.

51.    Plaintiff requests Judgment in an amount in excess of $400,000 against Defendant plus interest at the prevailing rate from the date of each breach that resulted in damages.

**WHEREFORE**, Plaintiff respectfully request that Judgment be had as requested herein, together with such other and further relief as the Court may deem just and proper, including costs.

Brian H. Reis, Esq. (7843)
Law Office of Brian H. Reis
Counsel for Plaintiff
80 Broad Street- 33rd Floor
New York, NY  10004
212-785-5170

8

EXHIBIT B

UNITED STATES DISCTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
YULY ARONSON,                                    :    Case No. 07 CIV 9405
                                                 :    (KMK)
                              Plaintiff,         :
                                                 :
            -Against-                            :         Order
                                                 :
ANTHONY BRANCA                                   :
                                                 :
                              Defendant.         :
-------------------------------------------------------------x

After hearing and consideration, it is **Ordered** that, ~~pending the outcome of this action~~ *until December 10, 2007*,

or further order of this court, the Defendant is preliminarily enjoined from the sale,

conveyance, transfer, encumbrance or pledging as collateral the following:


Property of Plaintiff; property of May Construction; Bank of New York Account No.

670-2308362; Prestige Financial Center/Account No. P6GGLKIR; Smith Barney Acct.

No. 147-62797-14; Smith Barney Acct. No. 147-03613-10; Smith Barney Acct. No. 578-

21674; Smith Barney Acct. No. 578-22807; Smith Barney accounts held in the name of

FCM Group, Inc.; property held by or in the name of Windward Holdings Corp.; property

held by or in the name of Bearhill, LLC.

Enter:

U.S.D.J.    11/28/07.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

NOV 30 2007

UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
YULY ARONSON,                                            :
                                                          :
                    Plaintiff                             :
                                                          :         Case No.: 07 CIV 9405
-Against-                                                 :         (KMK)
                                                          :
ANTHONY BRANCA,                                           :         ORDER UPON
                                                          :         STIPULATION
                                                          :
                                                          :
                    Defendant.                            :
------------------------------------------------------------x

Upon Stipulation of the parties to adjourn the hearing on Plaintiff's motion for a

preliminary injunction (the "motion") from December 10, 2007 to December 17, 2007 it

is hereby,

**ORDERED** that the prior briefing schedule is modified as follows: Defendant shall serve

and file his opposition by December 7, 2007; Plaintiff shall serve and file his reply

thereto by December 11, 2007, and it is further,

**ORDERED**, that by stipulation of the parties actually obtained, and irrespective of any

statute or rule to the contrary, the prior order of the court dated November 28, 2007 as to

the disposition of property (the "TRO"), incorporated herewith by reference, shall remain

in full force and effect past December 10, 2007, until further order of this court.

SO ORDERED,

_____
U.S.D.J.    11/30/07

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

12/13/2007 Case 7:07-cv-09405-KMK-GAY Document 20 Filed 12/19/2007 Page 1 of 1
Case 7:07-cv-09405-KMK-GAY Document 40-3 Filed 08/08/2008 Page 1 of 2
DEC 19 2007

LAW OFFICE OF
**BRIAN H. REIS**

80 BROAD STREET- 33rd FLOOR
NEW YORK, NEW YORK 10004

**MEMO ENDORSED** 5170
5179
.com

December 13, 2007

(Via Fax 914-390-4152)
Honorable Judge Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:     Yuly Aronson v. Anthony Branca
        07 CIV 9405

Dear Judge Karas:

I represent the Plaintiff in the above matter. I have spoken to counsel for the Defendant this morning regarding the production of documents that are being sought from Defendant by Plaintiff in support of the Injunctive Relief sought herein, and both counsel agree that given the amount of documentation required, that a joint request to briefly adjourn the hearing presently scheduled for December 17, 2007 is appropriate, and counsel for both parties have agreed that the TRO presently affect should be extended until by Your Honor until the rescheduled hearing .

I have conveyed this to your Law Clerk this morning who advised that if Your Honor is inclined to grant the above request, that counsel should call your Docket Clerk tomorrow to reschedule the hearing. I have conveyed this to counsel for Defendant and I represent that he has agreed to do so with me tomorrow.

With the above in mind, it is respectfully requested the hearing scheduled for Monday be adjourned briefly, and that you continue the TRO currently in place until the date of the rescheduled hearing.

I thank you sincerely for your consideration.

Very Truly Yours,

Brian H. Reis

Cc: Peter Goodrich (Via Fax 914-683-6770)

The hearing is adjourned
until January 8, 2008, at 10:00

SO ORDERED

KENNETH M. KARAS U.S.D.J.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

LAW OFFICE OF
# BRIAN H. REIS

80 BROAD STREET- 33rd FLOOR
NEW YORK, NEW YORK 10004

TEL (212) 785-5170
FAX (212) 785-5179
E-MAIL esqkape@aol.com

January 3, 2008

(Via Fax 914-390-4152)
Honorable Judge Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

**MEMO ENDORSED**

    Re:   Yuly Aronson v. Anthony Branca
            07 CIV 9405

Dear Judge Karas:

    I represent the Plaintiff in the above matter. I have just spoken to counsel for the Defendant this morning regarding the production of documents that are being sought from Defendant by Plaintiff in support of the Injunctive Relief sought herein, and both counsel agree that additional time is required to produce the requested documents. Therefore, both parties respectfully request a brief adjournment of the hearing presently scheduled for January 8, 2008. Counsel for both parties have agreed that the TRO presently in affect should be extended until by Your Honor until the rescheduled hearing.

    I am also authorized to advise that the parties are available for the rescheduled hearing of this matter from January 28, 2008 through February 1, 2008.

Very Truly Yours,

Brian H. Reis

Cc: Peter Goodrich (Via Fax 914-683-6770)

The hearing is adjourned until January 28, 2008 at 10 am. On the consent of the parties, the TRO will remain in effect until then.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

SO ORDERED

KENNETH M. KARAS U.S.D.J.
1/4/08

LAW OFFICE OF
**BRIAN H. REIS**

80 BROAD STREET- 33ʳᵈ FLOOR
NEW YORK, NEW YORK 10004

TEL (212) 785-5170
FAX (212) 785-5179
E-MAIL csqkapc@aol.com

January 22, 2008

**MEMO ENDORSED**

(Via Fax914-390-4152)
Honorable Judge Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:  Yuly Aronson v. Anthony Branca
07 CIV 9405

Dear Judge Karas:

I represent the Plaintiff in the above matter. I have spoken to counsel for the Defendant last week and this morning regarding the production of documents that are being sought from Defendant by Plaintiff in support of the Injunctive Relief sought herein, and both counsel continue to agree that given the amount of documentation required and the probable need to apply to Your Honor for an Order to produce documents, that a joint request to briefly adjourn the hearing presently scheduled for January 24, 2007 is appropriate. Counsel for both parties have agreed that the TRO presently affect should be extended until by Your Honor until the rescheduled hearing .I have conveyed this to your Law Clerk this morning.

I advise that counsel for the parties are available for the rescheduling of this matter during the last two weeks of February, other than February 26, 2008.

With the above in mind, it is respectfully requested the hearing scheduled for Thursday be adjourned briefly, and that you continue the TRO currently in place until the date of the rescheduled hearing.

I thank you sincerely for your consideration.

Very Truly Yours,

Brian H. Reis

Cc: Peter Goodrich (Via Fax 914-683-6770)

*The preliminary injunction hearing will be rescheduled until February 25, 2008, at 10 am.*

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

SO ORDERED

KENNETH M. KARAS U.S.D.J.
1/24/08

LAW OFFICE OF
**BRIAN H. REIS**

80 BROAD STREET- 33rd FLOOR
NEW YORK, NEW YORK 10004

TEL (212) 785-5170
FAX (212) 785-5179
E-MAIL esqkape@aol.com

February 20, 2008

(Via Fax914-390-4152)
Honorable Judge Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

**MEMO ENDORSED**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Re:     Yuly Aronson v. Anthony Branca
        07 CIV 9405

Dear Judge Karas:

    I represent the Plaintiff in the above matter. I have spoken to counsel for the Defendant yesterday at great length regarding the production of documents that continue to be sought by both parties in support of the positions relating to the TRO that is currently in place, and both counsel have now concluded that Motions to Compel the production of documents requested in subpoena's served upon the parties need to be filed in order to obtain the documents sought. Given the amount of documentation required and the fact that both parties will be filing Motions to Compel, the parties jointly request that Your Honor adjourn the Hearing presently scheduled for February 25, 2008.

    I advise that counsel for the parties are available for the rescheduling of this matter during the entire week of April 14 and the entire week beginning April 28, 2008.

    With the above in mind, it is respectfully requested the hearing scheduled for next Monday be adjourned, and that you continue the TRO currently in place until the date of the rescheduled hearing.

    I thank you sincerely for your consideration.

Very Truly Yours,

Brian H. Reis

*Granted. The hearing is adjourned until April 29, 2008, at 10:00*

Cc: Peter Goodrich (Via Fax 914-683-6770)

SO ORDERED

KENNETH M. KARAS U.S.D.J.
2/20/08

LAW OFFICE OF

**BRIAN H. REIS**

80 BROAD STREET- 33rd FLOOR                                      TEL (212) 785-5170
NEW YORK, NEW YORK 10004                                        FAX (212) 785-5179
                                                                E-MAIL esqkape@aol.com

April 22, 2008

(Via Fax914-390-4152)
Honorable Judge Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

**MEMO ENDORSED**

Re:   Yuly Aronson v. Anthony Branca
      07 CIV 9405

Dear Judge Karas:

I represent the Plaintiff in the above matter. The parties jointly seek an adjournment of the Hearing presently scheduled before Your Honor on April 29, 2008. The parties are presently scheduled to confer with Judge Yanthis this week (although due to a scheduling conflict as expressed to the clerk for Judge Yanthis, that conference is likely to be rescheduled for May 15, 2008) in an effort to resolve issues relating to the subpoenas served by the parties in support of the Hearing before Your Honor, and it does not seem that the parties will possess the documents required to prosecute and defend the injunctive relief sought before the hearing date previously set by Your Honor.

With the above in mind, the parties ask that Your Honor reschedule the date of the Hearing after May 15, 2008, with consideration of some time for the parties to provide documents as "So Ordered" by Judge Yanthis at the May 15, 2008 conference. I am not available for the rescheduled hearing during the week of June 9, 2008 as I am representing a client at a hearing during that week, if Your Honor can take that into consideration.

Very Truly Yours,

Brian H. Reis

Cc: Peter Goodrich (Via Fax 914-683-6770)

*The hearing is adjourned until June 4, 2008, at 11:15 am. The TRO presently in effect will remain so until the hearing.*

SO ORDERED.

KENNETH M. KARAS, U.S.D.J.

4/29/08

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

LAW OFFICE OF
# BRIAN H. REIS

80 BROAD STREET- 33rd FLOOR
NEW YORK, NEW YORK 10004

TEL (212) 785-5170
FAX (212) 785-5179
E-MAIL esqkape@aol.com

May 27, 2008

(Via Fax914-390-4152)
Honorable Judge Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

# MEMO ENDORSED

Re:   Yuly Aronson v. Anthony Branca
       07 CIV 9405

Dear Judge Karas:

As you may recall, I represent the Plaintiff in the above matter. Counsel for Defendant and I appeared before Judge Yanthis this morning and I am pleased to represent to you that His Honor satisfactorily resolved the document issues that had previously existed relating to the issued subpoenas. The only issue that remains, however, is the deposition of Defendant Branca.

As discussed with Your Honor during the last telephonic conference, I had served counsel for Defendant with a Subpoena to take the deposition of his client and had set the deposition date for May 23, 2008. As an accommodation to counsel for Defendant since he was leaving for an early Memorial Day vacation, we agreed to adjourn the deposition until June 2, 2008.

Just before entering the courtroom of Judge Yanthis today, counsel for Defendant advised me that his client was not available for the deposition on June 2nd, and that "when he advised me that June 2nd was acceptable, that he meant it was acceptable to him personally". I respectfully disagree with that statement, but nevertheless, the fact remains that Defendant does not appear to be available on June 2nd for the deposition.

Judge Yanthis Ordered that the deposition occur before June 4th, in deference to the scheduled hearing before Your Hour, and counsel for Defendant has advised me that his client is only available on June 3, 2008-- the day before the hearing before Your Honor. I believe that the deposition of Defendant will take longer then one day given the issues involved and the documents that we have received through discovery and which have now been ordered to be produced.

I am writing to you today Your Honor to ask for the final adjournment of this matter so that I can properly take the deposition of Defendant and present a right and

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

LAW OFFICE OF
**BRIAN H. REIS**

80 BROAD STREET- 33rd FLOOR
NEW YORK, NEW YORK 10004

TEL (212) 785-5170
FAX (212) 785-5179
E-MAIL csqkape@aol.com

coherent case to your Honor now that Judge Yanthis has Ordered the production of certain documents that I requested.

I have sought the consent of Counsel for Defendant to this request, and he is unable to consent based upon his client's instructions not to consent to the request. This is similar to the reasoning for the lack of consent to Amend the Compliant to include Smith Barney, which Your Honor has recently granted notwithstanding.

I will make myself available for the rescheduling of this matter any time during the months of June or July, except June 5th and during the period of June 16th through 24th, 2008. As an side, I will be out of my office for the remainder of today and tomorrow and will not be receiving facsimiles during that time, but if Your Honor requires an immediate phone conference to discuss this matter, I humbly ask that a message be left for me on voice mail to that effect.

Very Truly Yours,

Brian H. Reis

Cc: Peter Goodrich (Via Fax 914-683-6770)

The Court will adjourn, for the last time, the hearing until July 14, 2008, leaving in place the TRO originally entered in this case. The hearing will begin at 10 am.

SO ORDERED.

KENNETH M. KARAS, U.S.D.J.
5/28/08

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

YULY ARONSON,

                                        Plaintiff,                **STIPULATION**

        -against-                                                 Case No. 07 CIV 9405

ANTHONY BRANCA,

                                        Defendant.
-----------------------------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

        IT IS HEREBY STIPULATED AND AGREED, by and between the parties, that in lieu of conducting

a hearing to convert the present TRO to a permanent restraining order, the court will convert the present TRO

to a permanent restraining order with the following understanding: that defendant can do or take any actions

that will result in the appreciation of any of the properties, can continue to take any steps necessary to protect

and develop the properties with the further agreement that any such actions must be approved by plaintiff.

Further, that all monies expended for such development or appreciation will be the exclusive funds of

defendant. All requests for approval must be in writing and faxed to and received by plaintiff's attorney at

least 5 business days prior to taking the action requested. In the event plaintiff expends any funds with respect

to the above, he must maintain a record of all expenditures with back up documents. *The Clerk is to terminate any pending motions.*

Dated: July 10, 2008 White Plains, New York

SO ORDERED this 18th day of July, 2008

                        _____
                        Honorable Kenneth M. Karas

Branca's deposition.txt

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - x
YULY ARONSON,

                Plaintiff,

     -against-           Index No.:  07CIV9405

 ANTHONY BRANCA,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - x
                399 Knollwood Road
                White Plains, New York
                July 7th, 2008
                9:30 a.m.


        EXAMINATION BEFORE TRIAL of the

Defendant, ANTHONY BRANCA, pursuant to Court

Order and held at the above time and place and

before a Notary Public of the State of

New York.




           CARL ANDERSON
           Court Reporter
            PO Box 500
          Bedford, New York
           10506-0500
          (914) 234-3215

BY:  Kathryn MacDonald, Court Reporter


A



        A P P E A R A N C E S:
                Page 1

Branca's deposition.txt
LAW OFFICE OF BRIAN H. REIS
Attorney for the Plaintiff
80 Broad Street, 33rd Floor
New York, New York  10004
BY:  BRIAN H. REIS, ESQ.
      (212) 785-5170

GOODRICH & BENDISH
Attorneys for Defendant
399 Knollwood Road, #303
White Plains, New York  10603
BY:  PETER T. GOODRICH, ESQ.
      (914) 683-8484

A L S O   P R E S E N T:
YULY ARONSON, Plaintiff

A

          IT IS HEREBY STIPULATED AND AGREED by

and between the attorneys for the respective

parties hereto that this examination may be

sworn to by and before any notary public.

          IT IS FURTHER STIPULATED AND AGREED

that the filing and certification of the said
Page 2

Branca's deposition.txt

examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED
that all objections to questions, except as to
the form of the question, shall be reserved for
the time of trial.

A

1                                                          4
2  A N T H O N Y   B R A N C A, having been sworn
3         by Kathryn MacDonald, a Notary Public
4         of the State of New York, and stating
5         his address as 48 Davids Way, Bedford
6         Hills, New York 10507, was examined
7         and testified as follows:
8  EXAMINATION BY
9  MR. REIS:
10         Q.    Good morning, Mr. Branca.
11  My name is Brian Reis, I represent Mr. Aronson

Page 3

Branca's deposition.txt
12  in this matter.

13          We are here today because I am
14  going to ask you some questions.  If you have
15  any difficulty understanding the questions that
16  I ask, I ask that you let me know on the record
17  and that you ask me to rephrase the question if
18  you need to because if you answer the
19  question, I will assume you understand the
20  question.  Do you understand that?

21          A.   Yes.

22          Q.   We will take short breaks at
23  reasonable intervals.  If you need to use the
24  men's room at any time, let me know.  While a
25  question is pending, I ask that you do not

A


1               A. Branca                    5
2  speak to your attorney at all.  Do you
3  understand that?

4          A.   Yes.

5          MR. GOODRICH:  We will sort of
6          reserve on that.  If he has a question
7          as to the legality of the question, he
8          has a right to speak to me about the
9          legality.  I have no intention of
10         telling him how to answer the
11         question, but if he has a question as
12         to the legality of the question, it's
13         relevance, anything else, I think he
14         has a right to legal advice.

15         MR. REIS:  I disagree.
16         You can object as you see fit.

Branca's deposition.txt

17              MR. GOODRICH:  Well, maybe it
18        won't come up.
19        Q.    Mr. Branca, are you presently a
20   certified public accountant?
21        A.    Yes.
22        Q.    Were you a certified public
23   accountant at all times during your
24   relationship with Mr. Aronson?
25        A.    Yes.
A


 1                 A. Branca                    6
 2        Q.    Did your license lapse at any
 3   point in time?
 4        A.    No.
 5        Q.    How long have you known
 6   Mr. Aronson?
 7        A.    Approximately, '83, '84, '85.
 8              MR. GOODRICH:  You are talking
 9        about '19 --
10              MR. REIS:  I don't think we are
11        talking about '18.
12              MR. GOODRICH:  No, but I mean
13        it could be months, years.
14              MR. REIS:  I understood it to
15        be years.
16              MR. GOODRICH:  Okay.
17        Q.    Your address is 48 Bedford Way,
18   Bedford?
19        A.    Davids Way.
20              MR. REIS:  I'm sorry.

Branca's deposition.txt

21      Q.    Who owns that property?

22      A.    It is owned by an LLC.

23      Q.    What is the name of the LLC?

24      A.    266 North Street, LLC.

25      Q.    Who are the members of that LLC?

A

1                    A. Branca                    7

2       A.    My wife and myself.

3       Q.    Did Mr. Aronson contribute any

4  money towards the purchase of that property at

5  48 Davids Way?

6       A.    No.

7       Q.    Did he contribute any money

8  towards the upkeep or renovations of that

9  property?

10      A.    No.

11      Q.    Are you familiar with the

12 property at 7 Frederick Court in Harrison,

13 New York?

14      A.    Yes.

15      Q.    Who owns that property?

16      A.    It's sold.  I don't know.

17      Q.    Who owned that property to the

18 extent that you had an interest in that

19 property?

20      A.    266 North Street, LLC.

21      Q.    Was Mr. Aronson a member at any

22 time of that LLC?

23      A.    No.

24      Q.    Did Mr. Aronson contribute any

25 funds towards the purchase of that property?

Branca's deposition.txt

A

```
 1                    A. Branca                    8
 2            A.    No.
 3            Q.    Did Mr. Aronson contribute any
 4  monies towards the maintenance or renovation of
 5  that property?
 6            A.    No.
 7            Q.    When I say, "Mr. Aronson,"
 8  I mean Mr. Aronson or May Construction.
 9                  Did May Construction have an
10  interest in that LLC that we just discussed?
11            A.    No.
12            Q.    Did May Construction contribute
13  any monies towards the purchase of 48 Davids
14  Way or 7 Frederick Court?
15                  MR. GOODRICH:  First of all, I
16            am going to object because there is no
17            relevance as to May Construction
18            because May Construction is not a
19            party to this action.
20                  MR. REIS:  Can you answer that
21            question, please.
22                  THE WITNESS:  I'm not going to
23            answer it.
24                  MR. REIS:  You are instructing
25            him not to answer that question?
```

A

```
 1                    A. Branca                    9
 2                  MR. GOODRICH:  I am objecting.
```

Branca's deposition.txt

3              You can answer the question but I am

4              objecting because May Construction is

5              not a party to this action.

6         A.    What was the question?

7         Q.    The question is, did May

8 Construction contribute any monies towards the

9 purchase of those properties?

10        A.    Can you define "contribute"?

11        Q.    What is your understanding,

12 Mr. Branca, of the term "contribute"?

13        A.    A donation.

14        Q.    Using your understanding of the

15 word contribute, did May Construction

16 contribute any money towards the purchase of

17 48 Davids Way?

18        A.    No.

19        Q.    Did May Construction contribute

20 any money toward the purchase of 7 Frederick

21 Court?

22        A.    No.

23        Q.    Did May Construction contribute

24 any money toward the renovation of 48 Davids

25 Way?

A

1              A. Branca           10

2        A.    No.

3        Q.    And did May Construction

4 contribute any money toward the renovation of

5 7 Frederick Court?

6        A.    No.

7        Q.    Who owns 700 Summer Street?

Branca's deposition.txt

8         A.    I do.

9         Q.    And in your name, individually?

10        A.    It's owned in Windward Holdings

11   Corp.

12        Q.    When you say you do, who owns

13   Windward Holdings Corp.?

14        A.    I do.

15        Q.    Are you the sole owner of

16   Windward Holdings Corp. at all times since its

17   inception?

18        A.    No.

19        Q.    Who were the owners of Windward

20   Holdings Corp. since its inception?

21        A.    Yuly Aronson.  Myself.

22        Q.    How did it come to be that you

23   were the sole owner of Windward Holdings Corp.?

24        A.    Mr. Aronson wanted to sell

25   700 Summer Street.  I didn't want to sell

A


1                  A. Branca              11

2   700 Summer Street.  We put it on the market, we

3   obtained a buyer.  I paid Mr. Aronson his 50

4   percent of the 700 Summer Street and the other

5   assets that he was an owner of in Windward

6   Holdings.

7         Q.    Is Windward Holdings Corp. a

8   corporation?

9         A.    Yes.

10        Q.    Was Mr. Aronson a shareholder?

11        A.    Yes.

Branca's deposition.txt

12      Q.    When did he cease to become a

13  shareholder in Windward Holdings Corp.?

14      A.    I believe it was on or around

15  June and I am not sure if it was 2005 or 2006.

16  I believe it was 2005.

17      Q.    Did Mr. Aronson contribute

18  monies towards the acquisition of properties

19  within Windward Holdings Corp. while he was a

20  shareholder?

21          MR. GOODRICH:  I am going to

22          ask for a clarification.  You are

23          asking a question as a lawyer.  You

24          asked is Mr. Aronson -- I just want my

25          client to know that that is a specific

A


1                  A. Branca                12

2          legal question.  Mr. Aronson, as

3          opposed to any other entity that he

4          may have had; okay?  Just so we don't

5          have a lot of confusion later, saying,

6          well, you didn't understand the

7          question, you didn't do this and that.

8          If he owns stock in ABC Corporation

9          and he gave you a check from ABC

10          Corporation, Mr. Aronson did not give

11          you a check; ABC Corporation did.

12              You can answer the question.

13      A.    You are going to have to

14  rephrase the question and get a little more

15  specific.

16              (Question read back.)
                    Page 10

Branca's deposition.txt

17          A.    No.

18          Q.    Did May Construction contribute

19    any money towards the acquisition of properties

20    that were acquired by Windward Holdings?

21          A.    I am not 100 percent sure.

22    Do you have any documents that you can show me

23    that could refresh my recollection?

24          Q.    Can you answer my question,

25    Mr. Branca?

A


1                A. Branca                    13

2                MR. GOODRICH:  He did.

3                THE WITNESS:  I did.

4                MR. REIS:  Okay.  You are not

5          sure.

6          Q.    Who, other than yourself,

7    contributed money towards the acquisition of

8    properties that were obtained by Windward

9    Holdings Corp.?

10          A.    What properties?

11          Q.    What properties did Windward

12    Holdings Corp. own, Mr. Branca?

13          A.    Windward Holdings Corp. owns a

14    Fire Island house, it owns a piece of land down

15    in Florida and 700 Summer Street.

16          Q.    Are those the only properties

17    that Windward Holdings --

18          A.    I'm sorry.  It owns Bedford,

19    Middle Paten Road.

20          Q.    My question goes to each of

                        Branca's deposition.txt
21   those properties.

22              What entities contributed money

23   to purchase the Fire Island home that you just

24   referred to?

25        A.    I don't remember.

A


 1                   A. Branca                    14

 2        Q.    What entities contributed money

 3   to the Florida property that you referred to?

 4        A.    It was me, personally.

 5        Q.    Do you still own the Florida

 6   home?

 7        A.    It's land.  Yes, I do.

 8        Q.    At any point in time, did you

 9   ask Mr. Aronson to contribute monies towards

10   expenses related to the Florida property?

11        A.    No.

12        Q.    At any point in time, did

13   Mr. Aronson individually contribute money

14   towards the property in Florida?

15        A.    No.

16        Q.    At any point in time, did any

17   entity in which Mr. Aronson has an interest

18   contribute money toward the property in

19   Florida?

20        A.    No.

21        Q.    With regard to the Bedford

22   property, Middle Paten Road, did Mr. Aronson

23   contribute any money individually towards the

24   acquisition or development of that property?

25        A.    No.

Branca's deposition.txt

A

```
1                    A. Branca                15
2          Q.    Did Mr. Aronson's entity, May
3    Construction, contribute any money towards the
4    acquisition or development of that property?
5          A.    Yes.
6          Q.    How much was contributed?
7          A.    I don't know.
8          Q.    During what period of time was
9    money contributed?
10         A.    It was contributed from the
11   acquisition through the point in time that he
12   was no longer a member of Windward Holdings.
13         Q.    You don't know how much money
14   was contributed?
15         A.    No.
16         Q.    How were the monies paid from
17   May Construction to benefit that Bedford
18   property?  Were they paid to you or were they
19   paid to an entity?
20         A.    What do you mean by "entity"?
21         Q.    Were the monies contributed by
22   May Construction paid to Windward Holdings?
23         A.    No.
24         Q.    Who were the monies paid to?
25         A.    They were paid to the service
```

A

```
1                    A. Branca                16
2    providers directly.
```

Page 13

Branca's deposition.txt

3        Q.      And who wrote those checks?

4        A.      I did.

5        Q.      Did Mr. Aronson have knowledge

6  of you writing those checks?

7        A.      Yes.

8        Q.      Before you wrote those checks?

9        A.      Yes.

10        Q.      Did you ever forge a signature

11  of Mr. Aronson on a May Construction check?

12        A.      Forged his signature?

13        Q.      "Forged," meaning write his

14  signature without his permission?

15        A.      No.

16        Q.      Did you ever sign your signature

17  on a May Construction check without the

18  knowledge of Mr. Aronson?

19        A.      You have to define what you are

20  talking about.  I was signatory over the

21  account.  I was the controller, the vice

22  president of finance, and in that capacity for

23  May Construction, I signed 90 percent of every

24  check that went out of the office.

25        Q.      But you didn't answer my

A


1                    A. Branca                    17

2  question.

3        A.      I don't know how to answer your

4  question.

5        Q.      My question is, did you sign

6  your name on May Construction checks without

7  the knowledge of Mr. Aronson?

                    Page 14

Branca's deposition.txt

8          A.     No.

9          Q.     Is it your testimony under oath

10   that Mr. Aronson knew before you signed any

11   check on May Construction's behalf?

12          A.     I have no way of knowing that.

13          Q.     I thought that you just

14   testified that he knew.

15                 Let me clarify.  Did Mr. Aronson

16   know about every check you signed with your

17   name on May Construction's behalf?

18          A.     I have no way of knowing what

19   Mr. Aronson knew.

20          Q.     What was your procedure with

21   regard to writing checks during your tenure

22   with May Construction?

23          A.     As the bills became due, the

24   bills were paid.

25          Q.     Did you alert Mr. Aronson to the

A


1                      A. Branca                    18

2   bills that were being paid prior to them being

3   paid?

4          A.     I don't believe so.

5          Q.     To the best of your

6   recollection, Mr. Branca, did you sign any

7   checks on behalf of May Construction made

8   payable to your accounting firm in excess of

9   the amount that your accounting firm had

10   contracted with May Construction for accounting

11   services?

Page 15

                          Branca's deposition.txt
12          A.    No.

13          Q.    And you are quite sure of that?

14          A.    Yes.

15          Q.    What was your contractual

16   relationship with May Construction with regard

17   to your accounting firm?

18          A.    I had an engagement agreement

19   that said I would provide certain services for

20   a certain fee.

21          Q.    What was the fee?

22          A.    I would have to look at the

23   engagement agreement.

24          Q.    Okay.  I will show that to you

25   later on.  Does it refresh your recollection if

A

 1                     A. Branca                 19

 2   I represent that you were contractually

 3   committed to provide accounting services for

 4   $5,000 a month during your relationship with

 5   May Construction?

 6          A.    I'm sure it changed from year to

 7   year but $5,000, it may have been around there.

 8          Q.    What was your understanding of

 9   the services that your accounting firm was

10   supposed to provide for that $5,000 a month?

11          A.    I was taking care of all the

12   financials.  Paying the bills.

13          Q.    What else; if anything?

14          A.    It would be in the engagement

15   agreement.

16          Q.    But what is your understanding?
                          Page 16

Branca's deposition.txt

17          A.    I would like to see the

18    engagement agreement.

19          Q.    But what is your understanding?

20          A.    It lays it out in the engagement

21    agreement.  There is no need to speculate.

22    Pull out the agreement.  You said you have it

23    and we can look at it.  It says point by point

24    what I was providing.

25          Q.    What was your understanding,

A


 1                    A. Branca              20

 2    Mr. Branca?  If you don't answer the question,

 3    I am going to ask the Judge to make you answer

 4    the question.

 5          A.    Ask the Judge then.

 6          Q.    Can you tell me what your

 7    understanding was of the duty of

 8    A.A. Branca & Co. with regards to providing

 9    accounting services to May Construction?

10          A.    It's listed in the engagement

11    letter.  You said you have it.  We could just

12    pull it out and read through it.

13          Q.    Is it your testimony that you

14    have no understanding?

15          A.    No.

16          Q.    What is your understanding?

17          A.    Like I said earlier in the tape,

18    I was providing the accounting services for May

19    Construction.

20          Q.    And you testified that you were

Branca's deposition.txt

21  paying the bills.

22          A.      Correct.

23          Q.      Anything else?

24          A.      Preparing tax returns.

25          Q.      What else?

A

1                   A. Branca                    21

2           A.      I was consulting.  We had a long

3   close relationship.

4           Q.      Okay.  What else?

5           A.      That's all I can recall.

6           Q.      In some of the affidavits that

7   you have provided in this action, you have

8   indicated that you had an interest in May

9   Construction.  Do you recall that?

10          A.      Yes.

11          Q.      Other than what you have just

12  told me you did contractually to receive $5,000

13  per month, which you said was paying the bills,

14  preparing tax returns and consulting, what did

15  you do --

16                  MR. GOODRICH:  I'm going to

17              object to the question, right off the

18              bat, because he said it changed.  The

19              amount of the fee changed and you just

20              said for $5,000 a month.  That was not

21              his testimony.  If you're going to

22              repeat something, please repeat it

23              accurately.

24          Q.      It's your testimony that the

25  accounting fees changed; correct?

Branca's deposition.txt

A

```
 1                    A. Branca                22
 2          A.    Yes.
 3          Q.    We will examine that at another
 4  point in time.
 5                What did you do to warrant an
 6  interest in May Construction, other than what
 7  you just described your accounting firm did to
 8  warrant the payment of the accounting fees?
 9          A.    I brought certain projects to
10  May Construction.
11          Q.    What were those projects?
12          A.    There was a waste water
13  treatment plant in Williamsburg Ridge.  There
14  was a labor contract with a condo management
15  company.  There were spec houses that were
16  built.  I brought in private work, Yuly brought
17  in public work.
18          Q.    Define for me what you have
19  stated in your affidavit as the interest you
20  held in May Construction.
21          A.    I had a profit interest in May
22  Construction to the extent of 50 percent.
23          Q.    Was your profit interest limited
24  to those projects that you brought in?
25          A.    Yes.
```

A

```
 1                    A. Branca                23
 2          Q.    Did you receive payments from
```

Branca's deposition.txt

3  May Construction with regard to other projects

4  that you did not, quote unquote, bring in?

5          A.    No.

6          Q.    Was your interest, as you

7  defined it, memorialized in writing?

8          A.    Once upon a time it was.

9          Q.    Do you have that document?

10          A.    No, I don't.

11          Q.    What happened to that document?

12          A.    I have no idea.

13          Q.    What did that document say?

14          A.    It was a formal agreement that

15  memorialized our relationship, Yuly and I, in

16  May Construction.

17          Q.    Was that document notarized?

18          A.    No.

19          Q.    Who drafted that document?

20          A.    We both drafted the document.

21          Q.    And you do not possess a copy of

22  that document?

23          A.    No, I don't.

24          Q.    Mr. Branca, did you report your

25  50 percent interest in the profits, as you

A


1                  A. Branca                  24

2  testified, in your tax returns?

3          A.    I don't understand the question.

4          Q.    Did you report the 50 percent

5  interest that you just testified you held in

6  May Construction on your tax return, as a

7  shareholder in May Construction?

Page 20

Branca's deposition.txt

8          A.    I wasn't a shareholder of May
9    Construction.
10         Q.    Did you reflect your ownership
11   interest in May Construction in any way on your
12   tax return?
13         A.    All of the income that I
14   received was reported on my tax returns.
15         Q.    In which manner?
16         A.    They would run through various
17   LLC's.  Any of the accounting fees that were
18   cut to me were picked up by my personal tax
19   returns.  The LLC's are pass-through entities.
20   The net would come through my personal tax
21   return.
22         Q.    You just testified that the
23   interest was paid through the LLC's.
24               Was that your agreement with
25   Mr. Aronson in the document that you just
A

1                A. Branca                    25
2    testified about?
3          A.    To the best of my recollection,
4    the document wasn't specific on how the payment
5    would be made.  It just said that this was the
6    profit arrangement that we had.
7          Q.    What were the names of the LLC's
8    that you received your payments through?
9          A.    One was FCM Group.  One was
10   Windward Holdings.  Landmark Construction.
11         Q.    Is that it?

                        Page 21

Branca's deposition.txt

12          A.     To the best of my knowledge,

13    that's it.

14          Q.     Of the projects that you

15    mentioned to me just previously, which one of

16    the LLC's did you receive payment through?

17          A.     I don't remember.

18          Q.     Well, what was the reasoning, if

19    any, behind your receiving payment from FCM

20    Group versus Windward Holdings versus Landmark

21    Construction with regard to those projects?

22          A.     I don't remember.

23          Q.     Were they random?

24          A.     At the time they had a purpose.

25    I don't remember what the purpose was.  This

A


1                   A. Branca                26

2    goes back to 2005.

3          Q.     Is FCM Group a corporate entity

4    or an LLC?

5          A.     It's a corporation.

6          Q.     And who were the shareholders

7    since the inception of FCM Group?

8          A.     It was myself.

9          Q.     Let's talk a little bit about

10    Landmark Construction at this point.  Is that a

11    corporation or an LLC?

12          A.     It's a corporation.

13          Q.     Who were the shareholders of the

14    Landmark Corporation since its inception?

15          A.     It was myself.

16          Q.     At all times?

Branca's deposition.txt

17          A.    Yes.

18          Q.    Mr. Branca, you know you are

19  under oath; is that correct?

20          A.    Correct.

21          Q.    who was the president of

22  Landmark?

23          A.    Jan W-A-W-A-K.

24          Q.    Did you at any point in time, in

25  any documents, to the best of your

A

 1                  A. Branca                  27

 2  recollection, indicate that Jan Wawak was the

 3  100 percent shareholder of Landmark

 4  Construction?

 5          A.    Yes.

 6          Q.    You just testified that you were

 7  the only shareholder of Landmark Construction

 8  at all times.  Do you want to change your

 9  testimony?

10          A.    No.

11          Q.    Explain to me the

12  differentiation between your statement that you

13  were the only shareholder of Landmark and your

14  statement that Jan Wawak was the sole

15  shareholder.

16          A.    When May Construction was going

17  down the toilet, Yuly and I decided to use

18  Landmark Construction -- it was a company that

19  I had sitting on the shelf that I had set up

20  for somebody and they never paid me -- to try

Branca's deposition.txt
21  to establish a new construction company and

22  continue doing business.  Money was taken out

23  of May, joint funds, put into Landmark

24  Construction and we put Jan Wawak as the

25  president and tried to obtain more City work.

A


 1                  A. Branca                    28

 2          Q.    I'm going to break that down.

 3                You just testified that joint

 4  monies were taken out of May Construction,

 5  Mr. Branca.  Did you have monies in May

 6  Construction?

 7          A.    Yes.

 8          Q.    That you contributed personally?

 9          A.    The profits that were derived

10  from the projects that I brought in, I didn't

11  take the money out of May.  I left it in there.

12          Q.    Did you reflect in the

13  accounting documents of May Construction that

14  you were entitled to those monies that were

15  being held by May Construction?

16          A.    The monies were owed by Yuly

17  Aronson, so it was an off balance-sheet item

18  that didn't have to be reflected on the books

19  of May Construction.

20          Q.    They were owned by Yuly Aronson?

21          A.    They were owed.  Owed.

22          Q.    And you are testifying that that

23  did not need to be reflected --

24          A.    On the books of May

25  Construction.  Yes.

                        Page 24

Branca's deposition.txt

A

```
  1                    A. Branca                 29
  2             Q.    I want to understand that.
  3   A debt to somebody does not need to be
  4   reflected on the books of May Construction?
  5             A.    A debt to an individual does not
  6   have to be reflected on the books of May
  7   Construction.
  8             Q.    How did you reflect that debt to
  9   you?
 10             A.    We had a sheet where we would
 11   keep track of the "due to's" and the "due
 12   from's."  Every month we would review this
 13   sheet, agree on a balance, carry it forward.
 14             Q.    Did you maintain your accounting
 15   practice through the use of the computer system
 16   at the time you had a relationship with
 17   Mr. Aronson?
 18             A.    Did I maintain my accounting
 19   practice --
 20             Q.    Through the use of computers?
 21             A.    What do you mean?
 22             Q.    Did you use computers for
 23   maintaining the books and records of May
 24   Construction?
 25             A.    Yes.
```

A

```
  1                    A. Branca                 30
  2             Q.    Why, Mr. Branca, did you use a
```

Branca's deposition.txt
3  sheet to reflect the information regarding your

4  relationship with Mr. Aronson on the various

5  projects?

6          A.    Because it had nothing to do

7  with May Construction.  It had to do with Yuly

8  Aronson.

9          Q.    Did you have this type of

10  relationship with other clients of yours?

11         A.    No.

12         Q.    Were you a certified public

13  accountant for May Construction?

14         A.    Yes.

15         Q.    Do you believe that there was a

16  conflict between your services as the

17  independent certified public accountant for May

18  Construction and your undisclosed ownership

19  interest in May Construction?

20         A.    It's a grey area.

21         Q.    Tell me more about that grey

22  area.

23              MR. GOODRICH:  First of all, I

24              don't think he ever testified that he

25              was the owner.  Second of all, you

A


1                   A. Branca                    31

2              mischaracterized his testimony, again.

3              He said he had profit interest.  He

4              didn't say ownership interest.

5          Q.    Do you believe that there was a

6  conflict between your services as a certified

7  public accountant for May Construction and your

Page 26

Branca's deposition.txt

```
 8  undisclosed ownership interest in May
 9  Construction?
10          A.    I didn't have an ownership
11  interest in May Construction.
12          Q.    What was your interest?
13          A.    I had a profit interest.  The
14  profit interest would be from Mr. Aronson, who
15  was the sole owner of May Construction, to me.
16          Q.    Do you believe, and we will talk
17  about it more in front of Judge Karas --
18              MR. GOODRICH:  You know, I don't
19              need the veiled threats.  You have
20              asked him now three times if he
21              understands he's under oath.  He took
22              the oath.  He's a pretty smart guy; he
23              knows it.  He doesn't need to be told
24              we will discuss it further in front of
25              Judge Karas; okay?  He knows we have a
A
```

```
 1                  A. Branca                    32
 2              hearing.  So, we really don't need to
 3              go into that kind of veiled
 4              intimidation; okay?  This is a
 5              deposition.
 6          Q.    Do you believe that there was a
 7  conflict of interest between your services as a
 8  certified public accountant for May
 9  Construction and, as you described it, your
10  profit interest in May Construction?
11          A.    No.
```

Branca's deposition.txt

12          Q.      Did you disclose your profit

13    interest to the bonding companies?

14          A.      No.

15          Q.      Did you disclose your profit

16    interest to any of the vendors?

17          A.      No.

18          Q.      During the year 2006, did May

19    Construction run at a profit or a loss?

20          A.      I don't remember.

21          Q.      Do you recall if you took monies

22    out of May Construction while it was running at

23    a deficit?

24          A.      I don't remember.

25          Q.      Now, let's go back to Landmark

A


1                    A. Branca                    33

2    Construction.  You testified that you were the

3    100 percent shareholder and then you testified

4    about Jan Wawak.  Do you recall that?

5          A.      Correct.

6          Q.      On what documents did you, to

7    your recollection, place Jan Wawak as the 100

8    percent shareholder of Landmark Construction?

9          A.      There was a document that was

10    filed with New York City.

11          Q.      Do you believe, Mr. Branca, that

12    your representation or that your actions in

13    filing that with New York City was fraudulent?

14          A.      I didn't sign it.

15          Q.      Did you prepare it?

16          A.      I don't recall.

Page 28

Branca's deposition.txt

17          Q.     But you had knowledge at the
18    time that Mr. Wawak was not the 100 percent
19    shareholder of Landmark?  Isn't that correct?
20          A.     Correct.
21          Q.     Staying with Landmark, did there
22    come a time when you were responsible for the
23    removal of approximately $252,000 from an
24    account at Prestige Financial Center of New
25    York in the name of Landmark Construction?
A


 1                   A. Branca                    34
 2          A.     The removal?  The funds were
 3    transferred from Prestige to Smith Barney.
 4          Q.     Were you responsible for that?
 5          A.     Yes.
 6          Q.     Where, to the best of your
 7    knowledge, did that money come from that was
 8    deposited into Prestige Financial Center of
 9    New York?
10          A.     May Construction.
11          Q.     Did you know about that?
12          A.     Yes.
13          Q.     Did you sign the check that
14    was --
15          A.     I don't believe I did but I'm
16    not 100 percent sure.
17                 MR. GOODRICH:  Let him finish
18                 the question.  The record is not clear
19                 as to what check you are talking
20                 about.

Branca's deposition.txt
```
21                MR. REIS:  Did you understand my
22        question?
23                THE WITNESS:  I am going to
24        follow advice of counsel.
25                MR. REIS:  Did you understand my
A


 1                A. Branca                    35
 2        question?
 3                THE WITNESS:  There were
 4        numerous checks.
 5                MR. REIS:  Okay.
 6        Q.    How many checks were deposited
 7 into the Prestige Financial account?
 8        A.    According to your documents,
 9 two.
10        Q.    Did you sign those checks?
11        A.    Can you produce the checks?
12 I can tell you.
13        Q.    Mr. Branca, did you sign those
14 checks?
15        A.    I don't remember.
16        Q.    That's your testimony, that
17 those are monies that came from May
18 Construction?
19        A.    Correct.
20        Q.    Now, when did you become aware
21 of the existence of the Prestige account?
22        A.    I believe that I set up the
23 Prestige account.
24        Q.    Who did you contact at Prestige?
25        A.    I don't remember.
```

Branca's deposition.txt

A

```
 1                    A. Branca                  36
 2            Q.    How did you come to learn of
 3    Prestige?
 4            A.    That is the area where Yuly
 5    maintains all of his money.
 6            Q.    What was the purpose of you
 7    setting up, according to your testimony, the
 8    Prestige account?
 9            A.    The question was asked and
10    answered.
11            Q.    It was not.  What was the
12    purpose of you, as you testified, of setting up
13    the Prestige account?
14            A.    We were looking to set up
15    another construction company outside of May in
16    order to continue doing work in New York City.
17            Q.    That doesn't answer my question
18    as to why you set up an account at Prestige.
19            A.    Then the answer to your question
20    is, I don't remember.
21            Q.    You have testified that you, and
22    I emphasize you, set up Prestige.
23                  Do you have any of the documents
24    representing the opening of the account at
25    Prestige?
```

A

```
 1                    A. Branca                  37
 2            A.    No.
```

```
                    Branca's deposition.txt
3          Q.    Why not?

4          A.    I don't know.

5          Q.    Is your practice to maintain

6    copies of documents of all accounts that you

7    open?

8          A.    No.

9          Q.    What do you do with them?

10         A.    Sometimes they are saved in a

11   file, sometimes they are not.  But the

12   documents, that should be easy to obtain.

13   You could just subpoena Prestige.

14         Q.    I am just asking you questions

15   about the retention of the documents.

16               It's your testimony that you do

17   not have them; correct?

18         A.    Correct.

19         Q.    And you don't know who signed

20   the checks that were used to open that account;

21   correct?

22         A.    Correct.

23         Q.    What happened to the monies in

24   this Prestige account?

25         A.    The monies in the Prestige
A


1                    A. Branca                    38

2    account, when we realized that we were not

3    going to be able to set up this new company,

4    Yuly and I sat down, he said take the money,

5    put it on the sheet.  And at that time I opened

6    up an account at Landmark, a Landmark

7    Construction account at Smith Barney, and I
                         Page 32
```

Branca's deposition.txt

8   transferred the money from one account to

9   another.

10          Q.    Why did you do that?

11          A.    Because I don't do business with

12   Prestige.  Yuly does business with Prestige.

13          Q.    But it was May Construction

14   money you testified --

15          A.    No, I testified that it was

16   joint money.

17          Q.    Did you take the joint money and

18   move it to Smith Barney?

19          A.    Correct.

20          Q.    Did you tell Mr. Aronson that

21   you were doing that?

22          A.    Yes, I did.

23          Q.    And how much of that joint money

24   was his, in your testimony, and how much was

25   yours?

A

1                A. Branca                    39

2          A.    Half.

3          Q.    And after you took the money and

4   moved it to Smith Barney, where did the money

5   go from Smith Barney?

6          A.    I shut down the account.

7   I don't remember which account; I have other

8   accounts at Smith Barney.  It went to another

9   account in Smith Barney.

10          Q.    Are you familiar with an account

11   named the Branca Family Trust?

Page 33

                          Branca's deposition.txt
12        A.    Yes.

13        Q.    Do you have any reason to

14  believe that the money was transferred to that

15  account?

16        A.    It may have been.

17        Q.    Why would you have moved the

18  monies that were joint monies, according to

19  your testimony, to a joint family account?

20        A.    Once the money gets put on the

21  sheet, we agreed to any transfers of funds.

22  The sheet memorializes who is owed what and it

23  keeps a running balance.  Once the money is on

24  the sheet, Mr. Aronson's piece has been

25  recorded and he no longer has a piece of that

A


1                    A. Branca                    40

2   money.  And at that time, I can do whatever I

3   want with it.

4         Q.    But you are not answering my

5   question, again.  I want to know, the joint

6   money that went from Prestige to an account

7   that you set up at Smith Barney and then went

8   to the Branca Family Trust.  Would you agree

9   with me?

10        A.    I would have to see the

11  documents.

12              MR. GOODRICH:  He said it may

13        have.

14        Q.    I'm going to show you the

15  documents.

16              MR. GOODRICH:  Then maybe
                      Page 34

Branca's deposition.txt

```
17        that's a safer way to do it.  We have
18        had about three or four different
19        occasions when he's asked to see
20        stuff --
21            MR. REIS:  I will do it when I
22        want to.
23            MR. GOODRICH:  I understand
24        but then don't mischaracterize what he
25        said.
A


 1            A. Branca              41
 2        Q.    Do you have any reason to
 3  believe that the monies that went from Prestige
 4  to Smith Barney did not go into the Branca
 5  Family Trust?
 6        A.    I don't know.
 7        Q.    Where are the sheets that you
 8  have been referring to?
 9        A.    The sheets were with the paid
10  bills in May Construction's files that Yuly
11  took out, five or six boxes of documents out of
12  the office, when he moved out.
13        Q.    Is it your testimony that you
14  have no sheets other than what you have
15  produced to me thus far?
16        A.    Correct.
17        Q.    As an accountant, what is your
18  retention policy for documents you prepare for
19  a client or partner of yours?
20        A.    There are no rules; to the best
```

Page 35

                    Branca's deposition.txt
21  of my knowledge.

22          Q.      My question was, what was your

23  policy?

24          A.      My policy concerning the sheet?

25          Q.      Regarding your retention of

A


 1                  A. Branca                    42

 2  documents.

 3          A.      It depends on the document.

 4          Q.      What was your retention policy

 5  with regard to these sheets?

 6          A.      Once we agreed on the number,

 7  and we would have our monthly meeting, the

 8  balance would get carried forward to the next

 9  month's sheet.  Those sheets would get filed in

10  the paid bills with May Construction.  And the

11  retention for May Construction was what is

12  required for the IRS, which is four years.

13          Q.      When did you last perform

14  services for May Construction?

15          A.      I believe that was maybe in

16  2007, sometime, but I'm not 100 percent sure.

17          Q.      Where are the documents?

18          A.      The documents for 2007?  They

19  were all taken out by Mr. Aronson.

20          Q.      Do you have an obligation to

21  retain the documents that you prepare for

22  clients?

23          A.      Negative.

24          Q.      I don't understand what

25  "negative" means.

Branca's deposition.txt

A

```
  1                    A. Branca                43
  2          A.    Negative means no.
  3          Q.    Did you retain copies of those
  4   documents?
  5          A.    No.
  6          Q.    Were all of your documents
  7   handwritten for May Construction?
  8          A.    I would say most of them.
  9                MR. GOODRICH:  You are talking
 10          about the sheets or all documents?
 11                MR. REIS:  The sheets.
 12          A.    The sheets are all handwritten.
 13          Q.    Other documents that you
 14   prepared for May Construction, are they
 15   handwritten or on the computer?
 16          A.    What documents?
 17          Q.    Other documents that you
 18   prepared for May Construction.
 19          A.    Be more specific.
 20          Q.    What documents did you prepare
 21   for May Construction during your services as a
 22   certified public accountant?
 23          A.    Tax returns.
 24          Q.    Where are those tax returns?
 25          A.    They are on the computer.
```

A

```
  1                    A. Branca                44
  2          Q.    Did you produce them in this
```

Page 37

Branca's deposition.txt

3   action?

4          A.     Yes, I did.

5          Q.     What other documents did you

6   prepare?

7          A.     For May Construction?

8   That's it.

9          Q.     Did you prepare a general

10  ledger?

11         A.     The bookkeeper prepared the

12  general ledger.

13         Q.     Did the bookkeeper work for you?

14         A.     The bookkeeper worked for May

15  Construction.  She works for me now.

16         Q.     The bookkeeper was an employee

17  of May Construction?

18         A.     Yes.

19         Q.     Did you pay the bookkeeper any

20  compensation?

21         A.     Depending on -- You would have

22  to give me a time frame.

23         Q.     During the time period that you

24  were the certified public accountant for May

25  Construction.

A


1                  A. Branca                  45

2          A.     It changed.  Back in 2005,

3   before 2005, she was on my payroll.  2005 to

4   the end of May Construction, she was being paid

5   by May Construction.

6          Q.     Did Mr. Aronson know he was

7   paying her as an employee of May Construction?

                     Page 38

Branca's deposition.txt

8          A.     Mr. Aronson reviewed bank

9    statements every month.

10          Q.     Do you know if Mr. Aronson knew

11   that he was paying -- What was the person's

12   name?

13          A.     Lorraine Pellegrino.

14          Q.     Do you know if Mr. Aronson knew

15   that Lorraine Pellegrino was being paid by May

16   Construction as an employee?

17          A.     She was not an employee.  She

18   was a 1099.

19          Q.     So she was an independent

20   consultant?

21          A.     Correct.

22          Q.     Where did she work?

23          A.     700 Summer Street.

24          Q.     Prior to 2005, she was an

25   employee of your accounting firm?

A


1                    A. Branca                    46

2          A.     Correct.

3          Q.     And where are the documents that

4    she worked on prior to 2005, given your

5    statement of this four-year retention rule?

6          A.     Mr. Aronson was given a copy of

7    the general ledger.

8          Q.     Where is the copy that you would

9    have maintained pursuant to your requirement to

10   maintain documents --

11          A.     I don't have to maintain source

Page 39

Branca's deposition.txt

12  documents.  I have to maintain tax returns.

13  The document retention is the client's document

14  retention, not the accountant's document

15  retention.

16          Q.    What about the general ledger?

17          A.    Not required.

18          Q.    Did you retain it?

19          A.    No.

20          Q.    What did you do with it?

21          A.    The software was put on

22  Mr. Aronson's computer and he has all the

23  records on his computer, on his laptop.

24          Q.    Do you know Lorraine

25  Pellegrino's address?

A


1                  A. Branca                    47

2          A.    No.

3          Q.    Does she still work with you?

4          A.    Yes.

5          Q.    What was the reasoning behind

6  her changing her status as an employee of your

7  accounting firm to become an independent

8  consultant of May Construction?

9          A.    The independence rules changed

10  for CPA's in 2005.  We were no longer allowed

11  to provide bookkeeping services for clients and

12  do attest services; issue reports that we

13  signed.  So at that point in time, to maintain

14  my independence, we put Pellegrino on the books

15  of May Construction.

16          Q.    Was there a discussion with

Branca's deposition.txt

17    Mr. Aronson at any point in time about you

18    obtaining a shareholder interest in May

19    Construction?

20            A.    There were discussions.

21            Q.    And what became of those

22    discussions?

23            A.    I don't recall.

24            Q.    It is your testimony that

25    Mr. Aronson is no longer a member of Windward

A


 1                    A. Branca                    48

 2    Holdings; is that correct?

 3            A.    A shareholder of Windward

 4    Holdings.

 5            Q.    Shareholder; right.

 6            A.    Yes.

 7            Q.    Do you continue to ask

 8    Mr. Aronson for contributions for that entity?

 9            A.    No.

10            Q.    Has your attorney, to the best

11    of your knowledge, asked on your behalf for

12    contributions?

13            A.    Mr. Aronson has a 50 percent

14    interest in Middle Paten Road.  Middle Paten

15    Road is in the title of Windward Holdings.

16    That's the only way I can answer your question.

17    And Mr. Aronson owes development costs for

18    Middle Paten Road.

19            Q.    That were incurred as of when?

20            A.    Incurred from 2006 to present.

Branca's deposition.txt
21        Q.    Mr. Aronson is no longer a
22   member of Windward Holdings.
23        A.    Mr. Aronson has an interest in a
24   piece of property.
25        Q.    Is that documented or is that
A


1                   A. Branca                    49
2    just another understanding, if I may -- let me
3    finish, please -- Is that just another
4    understanding between you and Mr. Aronson?
5         A.    If Mr. Aronson doesn't want to
6    have an interest in the property, I would
7    gladly stop asking him for money for the
8    property.
9         Q.    Would you please answer my
10   question?  Is that interest documented or is
11   that just a verbal understanding between you
12   and Mr. Aronson?
13        A.    It's a verbal understanding
14   between Mr. Aronson and myself.  And being the
15   honest person that I am, I give him his piece
16   of what he has due.
17              MR. REIS:  I ask that be
18              stricken as not responsive.
19        Q.    Who owns the Bear Hill property?
20        A.    Bear Hill property is an LLC,
21   and it is owned by Mr. Aronson and myself,
22   50/50.
23        Q.    Is that documented?
24        A.    Yes, it is.
25        Q.    Now, you understand that the
                   Page 42

Branca's deposition.txt

A

1                    A. Branca                      50
2    Court in this action has restrained certain
3    accounts from transactions.  Have any accounts
4    that have been restricted been involved in any
5    transactions since the TRO?
6            A.    No.
7            Q.    Did you perform any accounting
8    functions for May Construction in 2007?
9            A.    I am sure I did.
10           Q.    What were those services?
11           A.    I don't remember.
12           Q.    Do you know what certified
13   payrolls are?
14           A.    Yes.
15           Q.    Did you prepare certified
16   payrolls for May Construction?
17           A.    Certified payrolls are --
18           Q.    I want you to answer the
19   question.
20           A.    Give me a time period.
21           Q.    You don't need a time period,
22   but the time period that you served as a
23   certified public account for May Construction.
24           A.    Sometimes.
25           Q.    When?
A

1                    A. Branca                      51
2            A.    I don't recall.

Branca's deposition.txt

3          Q.     Was it towards the end of your

4    relationship with May Construction?

5          A.     It was on and off during the

6    whole relationship of May Construction.

7          Q.     Why was it on and off?

8          A.     I am not 100 percent sure

9    whether they were prepared by me or Lorraine,

10   the bookkeeper.  She handled the payroll.

11         Q.     Well, when Lorraine prepared

12   them, was she employed by you or was she a 1099

13   with Mr. Aronson?

14         A.     With Mr. Aronson.

15         Q.     So any certified payrolls that

16   were done by Lorraine, by your testimony, must

17   have been prepared after 2005; correct?

18         A.     I couldn't say that with

19   100 percent certainty.

20         Q.     It was your testimony that

21   Lorraine was a 1099 after 2005?

22         A.     Yes.

23         Q.     So if she prepared any certified

24   payrolls it was while she was a 1099 for

25   May Construction?

A

1                    A. Branca                 52

2          A.     If she prepared any payrolls,

3    yes.

4          Q.     Is she, legally, to the best of

5    your knowledge as a certified public

6    accountant, allowed to certify payrolls?

7          A.     You don't have to be -- You

                          Page 44

Branca's deposition.txt

 8  could be an attorney and certify payrolls.

 9          Q.    Answer my question, sir.

10          A.    You have to repeat the question.

11          Q.    Was she legally allowed to

12  certify payrolls?

13          A.    She wasn't certifying payrolls.

14          Q.    I had asked you had she

15  certified payrolls?

16          A.    Do you know what a certified

17  payroll is?

18          Q.    What don't you define for the

19  record what a certified payroll is.

20          A.    A certified payroll is a

21  statement by the owner saying that he paid

22  proper wages.

23          Q.    And who signs that document?

24          A.    The owner of the company,

25  Mr. Aronson.

A


 1                  A. Branca                53

 2          Q.    Now, you testified that you

 3  prepared certified payrolls; correct?

 4          A.    Correct.

 5          Q.    When you prepared them, did you

 6  submit them to Mr. Aronson for his signature?

 7          A.    Absolutely.

 8          Q.    Did he rely upon your

 9  preparation as a certified public accountant?

10          A.    We're not going down this road.

11                  MR. GOODRICH:  Objection.

                        Page 45

Branca's deposition.txt
12            MR. REIS:  Answer the question.

13            MR. GOODRICH:  Well, objection.

14      It calls for the operation of his

15      mind.  Don't answer the question.

16      How would he know if he relied on it

17      or not?

18            Q.    Did Mr. Aronson have the

19 ability, in your mind, to look at the payroll,

20 the payroll documents that you provided to him,

21 to determine their accuracy?

22            A.    Yes.

23            Q.    Did he take the time, based upon

24 your interactions with him, to do that?

25            A.    Based on my knowledge of

A


1                    A. Branca                    54

2 Mr. Aronson, yes.

3            Q.    Did he do that?

4            A.    I can't tell you whether he did

5 or not.

6            Q.    What was your purpose of

7 preparing certified payrolls if Mr. Aronson

8 could do it himself?

9            A.    What's the purpose of me doing

10 bookkeeping when Mr. Aronson could do it

11 himself?

12            Q.    My question to you is, did he

13 pay you as your compensation to prepare

14 certified payrolls?

15            A.    Again, we go back to the

16 engagement letter.

                    Page 46

Branca's deposition.txt

17          MR. GOODRICH:  Let me get
18      something straight here because you
19      are confusing the record.
20      The preparation of a document is one
21      thing.  The certification is another
22      thing.  I think you are commingling
23      the two.  If I prepare a piece of
24      paper that says I certify it, and then
25      I hand it to the guy to certify it, my
A


1               A. Branca                55
2       understanding is that he is saying
3       that he certified it.  You are saying
4       "prepared a certification," which
5       means you prepared a complete
6       document including the certification.
7       I'm going to ask you to be a little
8       more clear.  Did he prepare a
9       piece of paper that was then certified
10      by the owner, or did he prepare a
11      certification that was done,
12      concluded?
13          MR. REIS:  Are you done?
14          MR. GOODRICH:  Yes.  I want an
15      answer.
16      Q.    My question to you is, did you
17  prepare documents that were submitted as
18  certified payrolls by May Construction?
19      A.    I prepared documents that were
20  titled certified payrolls.

Page 47

```
                       Branca's deposition.txt
21          Q.    And you prepared them
22  completely; correct?
23          A.    I don't know.  I don't know what
24  "completely" means.
25          Q.    Did you prepare the entire
A


 1                   A. Branca                  56
 2  document or did others prepare them?
 3          A.    As I said before, at certain
 4  times I prepared them.  At certain times
 5  Lorraine prepared them.  At no time did either
 6  one of us sign them.
 7          Q.    Understood.
 8          A.    Okay.
 9          Q.    Was preparing those documents
10  part of the services --
11          A.    Again, pull out the engagement
12  letter.
13          Q.    Listen carefully and answer the
14  question.  Was the preparation of those
15  documents part of the services that your firm
16  provided, to the best of your understanding?
17          A.    I couldn't answer the question
18  without looking at the engagement letter.
19          Q.    That's your answer?
20          A.    It's going to be my answer the
21  whole day.
22          Q.    Did you, in your accounting
23  sheets with Mr. Aronson, did you charge him
24  interest on money that you had advanced?
25          A.    When Mr. Aronson refused --
                        Page 48
```

Branca's deposition.txt

A


```
 1                    A. Branca                57
 2           Q.    Can you answer my question;
 3  yes or no?
 4           A.    Give me a time frame.
 5           Q.    At any time.
 6           A.    Yes.
 7           Q.    Did you reflect it on your tax
 8  return as interest?
 9           A.    It's only interest if you
10  collect it.  You, me, Pete, Yuly have expenses.
11  As tax payers, when you collect the money, you
12  have income.
13           Q.    In your accounting with
14  Mr. Aronson, did any of the money that you
15  received from him constitute interest?
16           A.    No.
17           Q.    Under what agreement with
18  Mr. Aronson did you charge him interest?
19           A.    I took the only written
20  agreement that we had which was the Bear Road
21  agreement.  The Bear Road agreement has a
22  clause in it that entitles interest for
23  delinquent capital contributions.
24           Q.    And you applied that to all the
25  investments?
```
A


```
 1                    A. Branca                58
 2           A.    I applied it only to two
```
Page 49

Branca's deposition.txt

3  investments that we had together; the Middle

4  Paten Road and the Bear Hill property.

5         Q.    But Middle Paten Road isn't

6  under the Bear Hill agreement; it it?

7         A.    No, it's not.

8               MR. REIS:  All right.  We have

9         been here an hour.  Let's take a short

10        break.

11              MR. GOODRICH:  What's your

12        definition of a short break?

13              MR. REIS:  Ten minutes.

14              (Break taken.)

15        Q.    Mr. Branca, during your services

16  as certified public accountant for May

17  Construction and during the entire time that

18  you held what you deemed to be a profit

19  interest in May Construction, tell me about

20  some of the forms that were submitted to the

21  State of New York on behalf of May

22  Construction.

23        A.    I don't know what you mean.

24        Q.    What forms did you prepare for

25  submission to the State of New York?

A

1               A. Branca                    59

2         A.    I don't know.

3         Q.    You don't know or you don't

4  remember?

5         A.    I don't know.

6         Q.    Did May Construction apply for

7  any loans during your relationship?

Page 50

Branca's deposition.txt

```
 8          A.    Yes.

 9          Q.    What banks did they apply for

10  loans through?

11          A.    Bank of New York.  Wells Fargo.

12  I don't recall anything else.

13          Q.    And what's your recollection of

14  the amounts that were applied for?

15          A.    The Bank of New York is a

16  $400,000 loan.  And Wells Fargo was, I think it

17  was maybe a hundred, hundred-fifty, maybe it

18  was two; I don't recall.

19          Q.    Did you prepare documents for

20  the submission?

21          A.    I don't recall.  If you have

22  them I could take a look at them.

23          Q.    If not you, who would have

24  prepared financial documents for submission of

25  those loans; if you know?

A
```

```
 1               A. Branca                    60

 2          A.    I don't.

 3          Q.    Do you know if Mr. Aronson may

 4  have?

 5          A.    He may have.  He applies for his

 6  own mortgages.  That's a financial document.

 7               MR. REIS:  Strike as not

 8          responsive.

 9               MR. GOODRICH:  Please don't.

10               You asked him the question and

11          he answered the question.
```

Branca's deposition.txt
```
12                MR. REIS:  No, the question was
13       for the loans and he discussed
14       mortgages, Mr. Aronson's personal
15       mortgages.  It's not responsive to the
16       question.
17                MR. GOODRICH:  It is.  You
18       asked him about loans and he said he
19       prepared his own mortgage
20       applications.
21                 MR. REIS:  For May
22       Construction.
23       Q.    Who did you speak to at Prestige
24  Financial when the account was opened?
25                MR. GOODRICH:  Asked and
A
```

```
 1                A. Branca                    61
 2       answered.
 3                MR. REIS:  Answer it again.
 4       A.    I don't remember the fellow's
 5  name.  I have it written down someplace.
 6  Todd, his name is Todd.  I don't remember the
 7  last name.  It starts with a "B".
 8       Q.    Did you sign the opening account
 9  documents?
10       A.    Yes.
11       Q.    What were the investment
12  objectives that you told Mr. Todd?
13       A.    I don't recall.
14       Q.    Did you get a copy of the new
15  account documents?
16       A.    I don't have it, otherwise,
```
                          Page 52

Branca's deposition.txt

17  I would have provided it to you.

18           Q.    Did you get a copy of it?

19           A.    I don't recall.

20           Q.    Tell me what documents do you

21  possess relating to FCM, Windward Holdings and

22  Bear Hill.

23              MR. GOODRICH:  Can we have it

24          one question at a time, please.

25              MR. REIS:  Absolutely.

A


 1                A. Branca                    62

 2           Q.    What documents do you have

 3  regarding FCM?

 4           A.    As far as what?

 5           Q.    What documents do you possess?

 6           A.    That's a pretty open-ended

 7  statement.

 8           Q.    Do you have vendor invoices?

 9           A.    For FCM?

10           Q.    Yes.

11           A.    No.

12           Q.    Do you have loan applications?

13           A.    No.

14           Q.    Do you have bank statements?

15           A.    FCM is no longer in business.

16  So for FCM I have got the agreement that Yuly

17  and I signed when we did the renovation on his

18  house using joint funds and getting my piece of

19  this money back.

20           Q.    Did you produce that document to

Branca's deposition.txt
21  me?

22          A.    Yes, I did.

23          Q.    You did?

24          A.    Yes, I did.

25                MR. REIS:  I don't believe you
A


 1                A. Branca                    63

 2          did but I will ask your attorney to

 3          produce that document.

 4                MR. GOODRICH:  It was produced

 5          and I have made reference to it

 6          before.

 7                THE WITNESS:  And we have the

 8          originals.

 9          Q.    What documents do you have

10  relating to Windward?

11          A.    I have the buy-out when I bought

12  Yuly's share of Windward Holdings.

13          Q.    What else?

14          A.    Tax returns.  Invoices, checks,

15  bank statements.

16          Q.    Surveys?

17          A.    All the paperwork was provided

18  to you; surveys, correspondence for the

19  subdivision.  And this pertains to the one

20  project in Windward Holdings, a project that

21  Mr. Aronson has an interest in.

22          Q.    You just testified that you

23  provided checks relating to Windward; is that

24  correct?

25          A.    Yes.  And we have the
                        Page 54

Branca's deposition.txt

A

```
 1                    A. Branca                    64
 2  development costs, canceled checks and
 3  invoices.
 4            Q.    Is it your testimony that you
 5  provided that to me?
 6            A.    I believe we did.
 7                  MR. REIS:  I don't believe you
 8            did but we will take that up with your
 9            attorney at another time.
10            Q.    While Mr. Aronson was a
11  shareholder of Windward, what were the
12  projects?
13            A.    There were none.
14            Q.    Just one?
15            A.    There were none.
16            Q.    There were none?  I'm not clear
17  then.  What did you buy him out of?  His
18  interest in what?
19            A.    We bought 700 Summer Street.
20            Q.    And that was not a project?
21            A.    That was not a project, no.
22            Q.    And what does Windward Holdings
23  own right now?
24            A.    Flip to your page one.  It was
25  asked and answered.
```

A

```
 1                    A. Branca                    65
 2            Q.    Can you answer it again?
```

Page 55

3          A.    It owns property in Florida, raw

4 land.  It owns 700 Summer Street.   It owns

5 Middle Paten Road.  And that's it.

6          Q.    And when did it acquire Middle

7 Paten Road?

8          A.    It acquired Middle Paten Road --

9 it was a contract vendee in 2004, say, and the

10 acquisition was done in 2006.

11          Q.    And that was after you --

12          A.    Correct.

13          Q.    Let me finish.  That was after

14 you acquired Mr. Aronson's interest in Windward

15 Holdings, according to your testimony?

16          A.    Correct.

17          Q.    And is it your testimony that no

18 demands have been made of Mr. Aronson for

19 expenses incurred in Middle Paten Road?

20          A.    I'm sorry?

21          Q.    Is it your testimony that no

22 demands have been made of Mr. Aronson for

23 contributions relating to expenses of Middle

24 Paten Road?

25          A.    No.  There have been demands for

A


1                 A. Branca                    66

2 expenses related to the development of Middle

3 Paten Road.

4          Q.    Can you explain to me how that

5 can be as you just testified that Mr. Aronson

6 was not an owner of Windward Holdings when you

7 acquired Middle Paten Road?

Branca's deposition.txt

```
 8          A.    Middle Paten Road, we were a
 9   contract vendee when we were together.
10          Q.    When you say "we," who do you
11   mean?
12          A.    Mr. Aronson and myself.
13          Q.    Under what corporate entity?
14          A.    Under Windward Holdings.  When
15   it came time to close on the property, we had a
16   couple of choices.  We could walk away from our
17   down payment and the money that we put into the
18   project already.  We could close on it, set up
19   a new entity.  This meant that we had to go
20   through all the applications again.  Or we
21   could close on Windward Holdings and we had an
22   agreement that you are the 50 percent on this
23   piece of property.  We opted to take the easy
24   path and close on Windward Holdings.  The
25   contract was in Windward Holdings, the permits
A
```

```
 1               A. Branca                  67
 2   had been filed under Windward Holdings and the
 3   work was in process while we were contract
 4   vendee.  And that's why demands were made of
 5   Mr. Aronson for the development costs.
 6               And, again, if he doesn't want
 7   to have a piece of the project, I will extract
 8   those costs and take them out of what he owes
 9   me.  That's not a problem.
10          Q.    Do you have all the documents
11   relating to that project?
```

Page 57

Branca's deposition.txt
12          A.    Correct.

13          Q.    Good.  After Lorraine Pellegrino

14  became a 1099 for May Construction, did you

15  adjust your accounting fees, since the services

16  that she had provided previously through your

17  accounting firm were no longer being provided?

18          A.    No.

19          Q.    Did you discuss that with

20  Mr. Aronson?

21          A.    No.

22                (Letter dated 12/16/06, 1 pg.,

23          marked Plaintiff's Exhibit 1 for

24          identification.)

25                MR. REIS:  After you have had an

A


1                    A. Branca                    68

2           opportunity to look at this, let me

3           know.

4           Q.    Do you recognize that document?

5           A.    Yes.

6           Q.    What is the date on this

7   document?

8           A.    December 16th, 2006.

9           Q.    Is that your signature?

10          A.    Yes.

11          Q.    Can you tell me how this

12  document came into existence?

13          A.    It was a document drafted by me.

14  I sat down with Yuly when his company was going

15  down the toilet and I resigned.

16          Q.    When you say it was going down

Branca's deposition.txt

17    the toilet, you had a profit interest in that

18    entity, didn't you?

19          A.    I had a profit interest in the

20    profit of the company; yes.

21          Q.    Did you take any responsibility

22    for the profit or loss of that company?

23          A.    Absolutely not.

24          Q.    Were you involved in any of the

25    deals that flowed through that company?

A


1                 A. Branca              69

2          A.    Of course.

3          Q.    Were you responsible for any of

4    the vendor relationships?

5          A.    No.

6                MR. GOODRICH:  What

7                responsibility?  Define

8                "responsibility."  He said before he

9                paid bills.  Are you talking about

10               something above and beyond that

11               requirement to pay bills or something

12               of that nature?

13               MR. REIS:  Did you understand my

14               question?

15               THE WITNESS:  It's kind of a

16               broad question.

17         Q.    Did you introduce any of the

18    vendors to May Construction for work on any of

19    the projects?

20         A.    No.

Page 59

Branca's deposition.txt

21        Q.    Did any of the projects that you

22   introduced to May Constructions result in

23   losses to May Construction?

24        A.    No.

25        Q.    What involvement did you have

A


1                      A. Branca                    70

2    after the introduction of some of those

3    projects to May Construction other than

4    preparing financials?

5         A.    None.

6         Q.    No engineering input?

7         A.    No.

8         Q.    Tell me how this document shown

9    in Exhibit 1 came to be.

10        A.    January 2007, I no longer wanted

11   to be the accountant for May Construction.

12        Q.    January 2007?

13        A.    Well, it says, "effective

14   January 1st, 2007."

15        Q.    And the date of the document is

16   December 16th, 2006?

17        A.    Correct.

18        Q.    The date of the document is

19   December 16th, 2006?

20        A.    Yes.

21        Q.    So your testimony is, as of

22   January 1st, 2007, you no longer desired to

23   work with the company?

24        A.    That's what the letter says.

25        Q.    And how did it come that

Branca's deposition.txt

A

```
 1                    A. Branca                    71
 2   Mr. Aronson signed this document?
 3            A.    We had a meeting in the office,
 4   my office, and we sat down.  I went through my
 5   file.  I gave him one of these.  I gave him a
 6   bill.  And I gave him a new engagement letter.
 7            Q.    When you say, "one of these,"
 8   what do you mean?
 9            A.    This, Exhibit 1.  I gave him
10   this.  I gave him an invoice for services that
11   were rendered and weren't paid.  And in my
12   file, I didn't have an original engagement
13   letter, so I had him sign another original
14   engagement letter.
15            Q.    I am talking about this document
16   right now.  What is the date of the signature
17   underneath Mr. Aronson's name?
18            A.    Mr. Aronson signed this
19   03/18/02.
20            Q.    Is that your signature of
21   Mr. Aronson's signature?
22            A.    No.
23            Q.    Do you know why it's dated 2002?
24            A.    The engagement letter is dated
25   2002.  I told you; we sat down, I gave him
```

A

```
 1                    A. Branca                    72
 2   this.  I gave him invoices --
```

Branca's deposition.txt
```
3              MR. GOODRICH:  Referring to

4       "this" as Exhibit 1.

5              A.    I gave him invoices that were

6    due for services rendered.  And I gave him the

7    engagement letter, saying, "please sign another

8    engagement letter, sign this and pay this when

9    you get a chance."  He had no problem.  The

10   company had hit an iceberg, it was going down,

11   and he was just taking whatever money he could

12   take out.

13             Q.    So is it your testimony that

14   this document dated December 16th, 2006, and

15   dated underneath Mr. Aronson's name March 2002,

16   was correct?

17             A.    No.  It should have been dated

18   2006.  It should have been dated the date on

19   the top, December 16th, 2006.  Mr. Aronson put

20   the wrong date on it when he signed it.

21             Q.    Or is that your signature's

22   date?

23             A.    No, it's not.  I have the

24   original.  It's pretty easy to prove this.

25             Q.    Is that your signature's date?
A

1                   A. Branca                    73

2             A.    No, it's not.

3                  (A.A. Branca & Co. letter,

4             03/09/02, 2 pgs., marked Plaintiff's

5             Exhibit 2 for identification.)

6                  MR. GOODRICH:  If you are going

7             to ask questions about this exhibit,
```
                         Page 62

Branca's deposition.txt

8         before you ask any questions, I want
9         an explanation as to what the black
10        mark on the top is.
11              MR. REIS:  You will have to ask
12        your own client since you produced
13        this.
14              MR. GOODRICH:  Your explanation
15        could be a very easy "I don't know";
16        okay?
17              MR. REIS:  My explanation is
18        that you have to ask your own client
19        because he produced this.
20              MR. GOODRICH:  With the black
21        mark on it?
22              MR. REIS:  That's correct.
23    Q.    Do you recognize that document?
24    A.    The document is not complete.
25    Q.    Do you recognize that document?
A

1               A. Branca                    74
2     A.    Yes.
3         Q.    Did you produce this to me with
4     the number one circled around it, in response
5     to a document request that I had sent to you
6     through your attorney?
7         A.    I don't remember the number one
8     on it but the document is my document.
9         Q.    And isn't it true that I had
10    forwarded a document request to your attorney
11    but you responded to it directly, yourself?

Page 63

Branca's deposition.txt

```
12          A.    Correct.

13          Q.    Now, what is this document?

14          A.    This is an engagement letter.

15          Q.    Is this the engagement letter

16   that you discussed previously, that if you

17   could see it, you would be better able to

18   advise me as to what your function was?

19          A.    Yes.

20          Q.    Have you had an opportunity to

21   review this?

22          A.    Yes.

23          Q.    In your services to May

24   Construction, did you fulfill this agreement

25   and did you perform all of these tasks?

A


 1                   A. Branca                    75

 2          A.    Probably not.

 3          Q.    Then you were in breach of

 4   contract?

 5          A.    Breach of contract?  This is an

 6   engagement letter which gives you the extent

 7   and the scope of my work.  And this is not a

 8   complete document.  This isn't the document

 9   that I sent to you.

10          Q.    I'm sorry?  This is not a

11   document --

12          A.    This is not the document that I

13   sent to you.

14                MR. GOODRICH:  I think he's

15          leaving the word "complete" out.  This

16          is not the complete document.
```

Branca's deposition.txt

17          Q.      Could you look at the first page
18  of Exhibit 2.  Do you see that document?
19          A.      Yes.
20          Q.      Look at the next page.  Do you
21  see page two?  And do you see your signature on
22  the bottom?
23          A.      Yes.
24          Q.      And do you see any reference to
25  the word "enclosures"?
A


 1                  A. Branca                    76
 2          A.      Correct.
 3          Q.      What is missing?
 4          A.      Signature page.
 5          Q.      Whose signature?
 6          A.      Mr. Aronson's signature.
 7          Q.      Do you have a copy of that?
 8          A.      Yes.
 9                  MR. REIS:  Would you produce
10          that to me at another time?
11                  THE WITNESS:  Yes
12          Q.      Looking at page two, do you see
13  the first paragraph that says, "In addition, we
14  will perform the following; we will prepare the
15  required Federal and State tax returns."  You
16  see that; right?
17          A.      Yes.
18          Q.      And, "We will be able to consult
19  or assist you on accounting, tax and
20  contemplated changes in business policies or

Branca's deposition.txt

21 other matters that you request."  Do you see

22 that?

23          A.    Yes.

24          Q.    "We will prepare certified

25 payroll reports for the various jobs as

A


 1                    A. Branca                    77

 2 required"; do you see that?

 3          A.    Yes.

 4          Q.    And you did that, didn't you?

 5          A.    At times.

 6          MR. GOODRICH:  Again, you have

 7          to qualify the word "prepared."

 8          Don't leave the impression that

 9          "prepared" means "complete."  Prepare

10          a report and complete a report.  I

11          just want the record to be clear that

12          he made it clear before.

13          MR. REIS:  You are arguing your

14          case, Mr. Goodrich.

15          MR. GOODRICH:  I'm not arguing

16          my case.  Just don't use the wrong

17          words.

18          MR. REIS:  Mr. Goodrich, I am

19          reading out of this document that

20          says, "We will prepare certified

21          payroll reports for the various jobs

22          as required."

23          Q.    That was what you had

24 contractually agreed to do with May

25 Construction; isn't it, sir?

Branca's deposition.txt

A

```
 1                     A. Branca                  78
 2          A.    If it's on this, yes.
 3          Q.    And your fees were set forth in
 4  this document?
 5          A.    Correct.
 6          Q.    And for the years 2005 through
 7  2007, you contractually agreed to bill May
 8  Construction $5,000 for the services as set
 9  forth in this document?
10          A.    Correct.
11          Q.    And for the year 2002; $4,000.
12  For the year 2003; $4,250.  And for the year
13  2004; $4,500.  Correct?
14          A.    Correct.
15          Q.    Did you bill May Construction in
16  excess of that amount for services rendered by
17  your accounting firm, Mr. Branca?
18          A.    No.  It does say that if there
19  is special work that is required, it would be
20  billed at an hourly rate.
21          Q.    Then I ask you again, did you
22  bill him in excess of --
23          A.    You didn't ask that question.
24          Q.    It's your testimony that you
25  were responsible for the preparation of May
```

A

```
 1                     A. Branca                  79
 2  Construction tax returns during the period that
```

Branca's deposition.txt

3  you served as a certified public accountant;

4  correct?

5          A.    Correct.

6          Q.    I want to discuss with you a

7  little more about your described profit

8  interest.

9                When May Construction was

10  applying for loans, did you provide Mr. Aronson

11  with the documents that were necessary to show

12  the allocated reserve of your profit that was

13  undisclosed in other documents, as you have

14  testified to me?

15          A.    There is no allocated reserve

16  for the undistributed profits.  The liability

17  existed between Mr. Aronson and myself, not May

18  Construction.  It would be as if I gave you

19  $10, you put $10 in your corporation, you owe

20  me the $10.

21          Q.    Then why do you say that you had

22  a profit interest in May Construction when you

23  just testified that your relationship was with

24  Mr. Aronson?

25          A.    The money was sitting in

A


1                A. Branca                    80

2  May Construction, based on the profit of the

3  jobs that I brought to the table that were

4  successfully completed by May Construction.

5          Q.    And your interest was only in

6  those jobs, correct, that you defined

7  previously in this deposition?

Page 68

Branca's deposition.txt

```
 8          A.     Correct.
 9          Q.     Okay.  What is Mr. Aronson's
10  interest in the Bear Hill property; sir?
11  Could you just remind me again?
12          A.     He's a 50 percent shareholder.
13          Q.     And what is the status of that
14  project?
15          A.     It's on hold.
16                 (Vendor Questionnaire, 27 pages,
17                 marked Plaintiff's Exhibit 3 for
18                 identification.)
19          Q.     What is this document?
20          A.     This is a Vendex form for the
21  City of New York.
22          Q.     And did you prepare this
23  document?
24          A.     Yes.
25          Q.     And you see the number 13 on top
A

 1                  A. Branca                    81
 2  on the document?
 3          A.     Yes.
 4          Q.     That's your handwriting;
 5  isn't it?
 6          A.     That, I can't tell.
 7          Q.     Is that your handwriting that
 8  says, "docs supporting owner of Landmark
 9  Construction."
10          A.     Correct.
11          Q.     And you provided that to me in
```

Branca's deposition.txt
12    response to a request that I had made through

13    your attorney?

14            A.    Correct.

15            Q.    Who was this submitted to?

16            A.    The City of New York.

17            Q.    And do you recognize the

18    handwriting in this document?

19            A.    Yes.

20            Q.    Whose handwriting is it?

21            A.    It's mine.

22            Q.    And in this document that was

23    submitted to the City of New York, who was

24    listed as the owner of Landmark?

25            A.    Jan Wawak.

A

 1                    A. Branca                    82

 2            Q.    And at that time, was Jan Wawak

 3    the owner?

 4            A.    No.

 5            Q.    Were you listed in here at all

 6    as having an ownership interest?

 7            A.    No.

 8            Q.    What was the purpose of

 9    submitting this document to the City of

10    New York?

11            A.    Money was taken out of May

12    Construction, put into the Landmark account

13    that was set up in an attempt to start another

14    construction company when May Construction was

15    going down the toilet.  Vendex form is required

16    to submit to the City of New York, New York, so

Branca's deposition.txt

17  that you could bid on jobs.  We were trying to

18  acquire bonding so we could get work through

19  New York City to continue business.

20          Q.    Is it your testimony that you

21  were actively involved in submitting this

22  document which is not correct --

23          A.    I prepared the document.

24          Q.    And you knew that the statements

25  contained in this document were not correct?

A


1                  A. Branca                    83

2          A.    The statements contained in the

3  document -- The ownership of Landmark could

4  have been given to Jan at any point in time.

5          Q.    Sir, my question to you is

6  different.  You knew at the time that you

7  prepared this document that the statements you

8  wrote in this document were not correct?

9          A.    If it was successful, the

10  ownership of Landmark would have been given to

11  Jan.

12          Q.    Mr. Branca, please answer my

13  question directly.  You knew at the time that

14  you prepared this document that the statements

15  contained therein were not correct?

16          A.    No, that is not true.

17          Q.    They were correct?

18          A.    No.  It was in the process of

19  being given to Jan.  If jobs were obtained, the

20  ownership would have been transferred to Jan.

Branca's deposition.txt

21          Q.    And that's the answer that you

22    want on the record; correct?

23          A.    Correct.

24          Q.    Did the City of New York ever

25    contact you regarding this application?

A


1                    A. Branca                    84

2          A.    No.

3          Q.    Have you testified under oath

4    before?

5          A.    Yes.

6          Q.    In what capacity?

7          A.    Divorce.

8          Q.    Anything else?

9          A.    That's it.

10                (Windward Holdings document,

11                06/01/05, 1 pg., marked Plaintiff's

12                Exhibit 4 for identification.)

13          Q.    What is this document?

14          A.    This is the buy-out of Yuly's

15    share and interest in Windward Holdings Corp.

16          Q.    Did you sign Mr. Aronson's

17    signature on this document?

18          A.    Negative.  No.

19          Q.    Is there a reason why it's not

20    notarized?

21          A.    None of the documents that we

22    have between each other have been notarized.

23    It's memorialized by the cancelled check.  And,

24    again, this is not the complete document that I

25    gave to you.  This is one page of the documents

Branca's deposition.txt

A

```
 1                    A. Branca                    85
 2  that were attached to this.
 3                    MR. REIS:  Thank you.
 4           Q.    Now, getting back to May
 5  Construction, did you maintain a general ledger
 6  for May Construction?
 7           A.    Yes.
 8           Q.    And balance sheets?
 9           A.    Yes.
10           Q.    And your testimony today is that
11  you no longer possess that?
12           A.    Correct.
13                    MR. REIS:  Let me take a
14           ten-minute break.  I want to get
15           some documents together for you to
16           review.
17                    (Break taken.)
18           Q.    Mr. Branca, getting back to
19  Landmark for a moment, what is your
20  recollection of how much time passed between
21  the time that a deposit was made into Prestige
22  and the time that you moved it to the FCM
23  account at Smith Barney?
24           A.    Months.
25           Q.    And during those months that you
```

A

```
 1                    A. Branca                    86
 2  believe passed, it's your testimony that May
```

Branca's deposition.txt
3    Construction was doing poorly and that was the
4    reason for the transfer?
5              A.    The reason for the transfer was
6    to set up another entity to do business with
7    New York.
8              Q.    Would it surprise you if I told
9    you it was a matter of weeks between the time a
10   deposit was made into Prestige and the time you
11   moved it to FCM, which is the entity that you
12   have sole interest in?
13             A.    Hold on.  I thought you were
14   talking about moving it from Prestige to Smith
15   Barney.
16             Q.    Correct.
17             A.    Show me the documents that
18   leaves a foot print.
19             Q.    I will.  Would it surprise you
20   if I told you that that's what happened; that
21   it was a matter of weeks?
22             A.    From the time the Prestige
23   account was set up and the time it was moved
24   over to Smith Barney?
25             Q.    Yes.
A


1                   A. Branca                    87
2              A.    That would be surprising.
3              Q.    Take a look with me again at
4    Exhibit 3, it's the vendor questionnaire.
5    Do you have that in front of you?
6              A.    Yes.
7              Q.    What was the gross revenue of
                        Page 74

Branca's deposition.txt

8  Landmark at the time you prepared this

9  document?

10         A.    It was zero.

11         Q.    Would you look with me at page

12  two of this document, 1(f), and tell me what

13  you marked off as the gross revenue in the

14  document that was submitted to New York?

15         A.    A million, two-two-five.

16         Q.    Was that true?

17         A.    This was what was projected to

18  be done.

19         Q.    Is that what the question asked

20   for, Mr. Branca?

21         A.    That's the way I interpreted the

22  question to be asked.

23         Q.    So when you see the words,

24  "annual gross revenue," you interpret it in

25  your mind to mean "projected"?

A

1                  A. Branca                    88

2         A.    In this document, yes.

3         Q.    Where does it give you the

4  indication that "projected" is what is called

5  for in that question?

6         A.    This was a shell corporation.

7  I was trying to get registered with New York.

8  We had an agreement between Yuly, myself and

9  Jan; we were all going to have a third

10  interest, with Jan being the beneficial

11  shareholder to this entity.

Page 75

Branca's deposition.txt

12          MR. REIS:  Strike as

13     non-responsive.

14          Q.    Where in the document does it

15     show you some indication that this is asking

16     for revenue that potentially would be earned?

17          A.    I don't see it.

18          Q.    You testified that Mr. Wawak

19     could have received ownership interest of this

20     entity; correct?

21          A.    Yes.

22          Q.    Look at 6(b).  That question

23     reads, "Pursuant to any stock options or any

24     other arrangements, does any individual or

25     entity have the right within the next three

A


1                    A. Branca                    89

2     years to acquire stock in a submitting vendor,

3     which, when combined with current holdings,

4     would make such an individual or entity a

5     principal owner or officer?"

6               What did you respond to that

7     question?

8          A.    No.

9          Q.    Was that true at the time?

10          A.    Jan Wawak was, in this document,

11     the 100 percent owner.  There was nobody else

12     that had the right to get stock, buy stock.

13          Q.    But this document, you testified

14     that it was not true; Jan was not the owner.

15          A.    I testified that he was the

16     beneficial owner of the stock.  At any point in

Branca's deposition.txt

17    time, we could have transferred stock to

18    Mr. Wawak.

19          Q.    How was he the beneficial owner?

20          A.    The agreement made between

21    Mr. Wawak, Mr. Aronson and myself, was that he

22    was going to be the 100 percent shareholder

23    in Landmark Construction.

24          Q.    Where is that agreement?

25          A.    Verbal agreement.

A


 1                A. Branca                    90

 2          Q.    Verbal agreement.  And as a

 3    certified public accountant, that's sufficient

 4    for you?

 5          A.    It has nothing to do with

 6    certified public accountant.  I'm not

 7    certifying anything.

 8          Q.    In your background as a business

 9    person, was that sufficient?

10          A.    I have a 25-year relationship

11    with Mr. Aronson.  It was plenty sufficient

12    for me.

13          Q.    Was it sufficient for you to

14    respond "no" in that document?

15          A.    In this document right here?

16          Q.    Yes.

17          A.    The answer to the question is

18    absolutely no.

19          Q.    Okay.

20                (Bank of New York copies of

```
                         Branca's deposition.txt
21          checks and bank statements, 8 pgs.,
22          marked Plaintiff's Exhibit 5 for
23          identification.)
24              MR. REIS:  Please review that
25          and let me know when you are done
A


 1                  A. Branca                 91
 2          reviewing those documents.
 3          Q.    Looking at the first page of
 4  that document, Mr. Branca, that's a check drawn
 5  on the account of May Construction.  Do you see
 6  that?
 7          A.    Yes.
 8          Q.    Made payable to your accounting
 9  firm, A.A. Branca and Co., CPA.  Do you see
10  that?
11          A.    Yes.
12          Q.    Whose signature is that on the
13  check?
14          A.    Mine.
15          Q.    What is the dollar amount for?
16          A.    Twenty thousand.
17          Q.    What was the purpose of that
18  $20,000 payment from May Construction to your
19  accounting firm?
20          A.    Accounting fees.
21          Q.    And that was in the month of
22  March 2005; would you agree?
23          A.    Yes.
24          Q.    Let's look at the next page.
25                That is a check also made
```

Branca's deposition.txt

A

```
 1                    A. Branca                   92
 2   payable to A.A. Branca and Co.?
 3          A.    Yes.
 4          Q.    Drawn on the account of May
 5   Construction?
 6          A.    Correct.
 7          Q.    Whose signature?
 8          A.    Mine.
 9          Q.    The amount of $15,000?
10          A.    Both of these checks look like
11   they were co-signed by Yuly.  Yes, it is
12   fifteen thousand.
13          Q.    What is the date of that check?
14          A.    I can't read the date but it's
15   in the month of April; 04/26.
16          Q.    And what was that for?
17          A.    Accounting fees.
18          Q.    So $35,000 was paid to your firm
19   in a two-month period in 2005; correct?
20          A.    Correct.
21          Q.    Do you have copies of the May
22   Construction checks made prior to the year
23   2005?
24          A.    You gave them to us.  No, you
25   didn't.  You didn't give us 2005, you didn't
```

A

```
 1                    A. Branca                   93
 2   give us 2006.
```

Branca's deposition.txt

3          Q.     My question is, do you have

4     copies of the checks --

5          A.     No, I don't.

6          Q.     Looking at the next page; do you

7     recognize that?

8          A.     Yes.

9          Q.     And there are two checks on that

10    page?  One for $4,000 and one for $21,000 made

11    payable to Smith Barney?

12         A.     Correct.

13         Q.     And the date on the check is

14    01/10?  Would you agree with me?

15         A.     Yes.

16         Q.     And whose signature appears

17    on it?

18         A.     Yuly's.

19         Q.     Is that your forgery of

20    Mr. Aronson's signature?

21         A.     It's not a forgery.  I was

22    authorized to sign checks for Mr. Aronson.

23         Q.     Is that your signature then of

24    Mr. Aronson's signature?

25         A.     I believe so, yes.

A


1                    A. Branca                    94

2          Q.     Why would you, Mr. Branca, sign

3     Mr. Aronson's signature if you were a signatory

4     to the account?

5          A.     In 2005, they changed the

6     accounting rules.  I couldn't sign checks, I

7     couldn't do bookkeeping services if I was going

Branca's deposition.txt

8  to issue financial statements.  So the checks

9  had to be signed by Mr. Aronson.  In his

10 absence, I signed his signature.

11        Q.    Do you have that in writing?

12        A.    No.  Mr. Aronson reviewed every

13 bank statement, every month, in detail.  And

14 there wasn't any question back in 2006.

15        Q.    Were you signing at that time in

16 the capacity as a profit owner of May

17 Construction or as a certified accountant or as

18 his buddy?

19        A.    Neither.  I was performing a

20 function for May Construction.

21        Q.    In the capacity of the certified

22 accountant which you held?

23        A.    No.  The functions that were

24 being performed were bookkeeping functions, not

25 certified public accountant functions.

A


1                 A. Branca              95

2        Q.    Through your accounting firm.

3        A.    And in conjunction with the

4  accounting firm.

5        Q.    But through your accounting

6  firm.  Did you bill as part of the $5,000 per

7  month to May Construction, the signing of

8  checks as part of the function of the

9  accounting firm or was it something separate?

10        A.    No, it was never billed.

11        Q.    And did a document exist or a

Page 81

Branca's deposition.txt

12 document did not exist giving you the power to

13 sign Mr. Aronson's signature?

14          A.    A document did not exist.

15 It was common practice.

16          Q.    Common practice in the

17 profession?

18          A.    In May Construction.

19          Q.    That someone would sign it or

20 that you would sign it?

21          A.    That I would sign his name.

22          Q.    Okay.  Good.

23                That check was made payable to

24 Smith Barney.  Why?

25          A.    At the beginning of the year, we

A


1                  A. Branca                    96

2 would fund retirement accounts.  Yuly, his wife

3 and me.

4          Q.    In equal proportions?

5          A.    To the maximum amount that the

6 retirement accounts could be contributed to.

7          Q.    Was that deducted from your

8 interest percentage?

9          A.    Yes.

10          Q.    Your interest was 50 percent of

11 the projects that you brought to May

12 Construction; correct?

13          A.    The profits in the projects;

14 yes.  The profit only.

15          Q.    I would like for you, with as

16 much detail as possible, to tell me the full

Page 82

Branca's deposition.txt

17   name of the projects that you brought to the

18   firm.

19          A.    I gave them to you.

20          Q.    I would like you to do it again,

21   please.

22          A.    I did it already.  Just read it

23   back.

24          Q.    You're not doing it again?

25          A.    I'm not doing it again.

A


 1                  A. Branca                  97

 2              MR. REIS:  Let the record

 3          reflect that Mr. Branca is not

 4          answering my question.

 5               MR. GOODRICH:  Let the record

 6          reflect that he did answer it once.

 7          He wrote it down, I wrote it down.

 8          We could be here all day if you want

 9          to ask the same question a thousand

10          times.

11          Q.    Mr. Branca, the projects that

12   you referred to earlier, were those the only

13   projects that you brought to May Construction?

14          A.    I would have to go back and

15   recreate.

16               MR. REIS:  I would like you to

17          do that.  Could you please take the

18          time and make sure that I get that by

19          Monday for the TRO hearing

20          before Judge Karas?

Branca's deposition.txt
21            MR. GOODRICH:  No, we will not.

22       You are asking him to do something

23       now.  If he needs more time, he will

24       do it.  We will take it under

25       advisement.  Mr. Aronson has all the

A


 1                 A. Branca                    98

 2       records.

 3            Q.    You have no independent

 4  knowledge of the projects that you brought to

 5  May Construction?  Is it your testimony that

 6  Mr. Aronson's records only reflect what you

 7  brought in?

 8            A.    All the records reflecting the

 9  jobs that I brought in to May Construction

10  would be contained in the records, in the files

11  that Mr. Aronson has, along with the sheets.

12            Q.    I'm asking you for the names of

13  the projects.  Do you have an independent

14  recollection, other than the ones you said

15  previously, of those projects?  Do you have an

16  independent recollection of those?

17            A.    I gave you three names off the

18  top of my head when you hit me blind-side with

19  this stuff.  I think that's pretty good.

20            Q.    I don't know if that's pretty

21  good or not, but, be that as it may, were the

22  checks to Smith Barney deposited in your

23  account at Smith Barney?

24            A.    Yes.

25            Q.    Why weren't those checks made
                            Page 84

Branca's deposition.txt

A

1                          A. Branca                    99
2    payable to you as an individual to be deposited
3    to a Smith Barney account?
4            A.    I don't know.  At the time, it
5    was easier to just cut the checks to Smith
6    Barney.
7            Q.    Easier than just typing in
8    "Anthony Branca"?
9            A.    Then I would have had to deposit
10   the money, wait for it to clear and send the
11   check to Smith Barney.
12           Q.    You could have deposited it
13   right into the Smith Barney account; couldn't
14   you?
15           A.    Not into the retirement account.
16   That check would have to be made out to Smith
17   Barney.
18           Q.    What year is this?  2006?  Okay.
19   Next page, please.  This is a check made
20   payable to A.A. Branca & Co.; correct?
21           A.    Correct.
22           Q.    Is that your signature?
23           A.    Yes.
24           Q.    Made payable -- March 22nd,
25   2005?
A

1                          A. Branca                   100
2            A.    It's the same check as the first
                          Page 85

```
                       Branca's deposition.txt
3  page.
4           Q.     You are right.  I apologize.
5  I have a duplication, I apologize.  As is the
6  next one.
7                  Look with me at the page with
8  check number 10854.  Do you see that?
9           A.     Yes.
10          Q.     Made payable to A.A. Branca and
11  Co.?
12          A.     Yes.
13          Q.     Whose signature is that?
14          A.     It appears to be my signature of
15  Yuly's signature.
16          Q.     Payable in the amount of
17  $10,000?
18          A.     Correct.
19          Q.     September 2006?
20          A.     Correct.
21          Q.     What was that check for?
22          A.     Accounting fees.
23          Q.     And the next page, check made
24  payable to A.A. Branca, October 2006, for
25  $10,000?
A

1                  A. Branca                    101
2           A.     Correct.
3           Q.     Is that your signature or
4  Mr. Aronson's signature?
5           A.     It appears to be my signature.
6           Q.     And the next one?
7           A.     The same.
                       Page 86
```

Branca's deposition.txt

8          Q.      Made payable to A.A. Branca,

9    dated December 6th, 2006, for $10,000; correct?

10          A.      Correct.

11               (Smith Barney Business FMA

12          statement, Smith Barney Business FMA

13          statement, and CitiGroup Smith Barney

14          statement marked Plaintiff's Exhibits

15          6, 7 and 8 for identification.)

16          Q.      Mr. Branca, looking at

17   Exhibit 6, take a look at the second to the

18   last page.  Do you recognize that document?

19          A.      No.

20          Q.      The name of that document is

21   called an account transfer authorization; do

22   you see that?

23          A.      Yes.

24          Q.      Is that your signature on the

25   bottom of the page?

A

1               A. Branca                    102

2          A.      No.  Yes.

3          Q.      What's the date next to your

4    name?

5          A.      12/21/06.

6          Q.      Do you know what the purpose of

7    that document is?

8          A.      This is to transfer money from

9    one brokerage account to another.

10          Q.      And in that document up on top,

11   do you see the account title?

Page 87

Branca's deposition.txt

12          A.     "Landmark Construction of

13   New York, Inc."

14          Q.     Underneath it, can you read what

15   is handwritten?

16          A.     "FSA ADP Clearing" and

17   something-services.

18          Q.     Out-sourcing services?

19          A.     Okay.

20          Q.     Now, looking at the first page

21   of Exhibit 6, what is the name of the account

22   at Smith Barney?

23          A.     "Landmark Construction of

24   New York."

25          Q.     What is the address of this

A


1                    A. Branca                    103

2    account?

3           A.     700 Summer Street.

4           Q.     What is the name of the person

5    whose attention the account should be

6    brought to?

7           A.     My name.

8           Q.     Isn't it true this is the

9    account that you established with Smith Barney

10   in the name of Landmark?

11          A.     Correct.

12          Q.     Isn't it also true that that

13   account transfer document was the document that

14   initiated the transfer of money from Prestige

15   into the account that you established at

16   CitiBank?

Branca's deposition.txt

17          A.    Yes.  Well, I established both
18  accounts.
19          Q.    Please answer my question.
20          A.    I established the account at
21  Prestige, also.
22          Q.    Please answer my question.
23          A.    I transferred it from one
24  account to another.
25          Q.    Please answer my question.
A

 1                  A. Branca                104
 2  Mr. Branca, the transfer document was the one
 3  that was responsible for the transfer of funds
 4  from Prestige to this account at CitiBank?
 5          A.    Correct.
 6          Q.    Looking at the first page of
 7  Exhibit 6, do you see on the bottom that about
 8  $152,000 came in.  Do you see that?
 9          A.    Yes.
10          Q.    Do you see that $152,900 and
11  $100,000 was sent out?
12          A.    No.  Where?
13          Q.    Looking at the bottom of the
14  page.  Do you see where it says "redemption"
15  and a minus sign?
16          A.    Yes.
17          Q.    What does a "minus" sign mean to
18  you in this document?
19          A.    It's taken out.
20          Q.    Taken out.  Do you see

                         Page 89

Branca's deposition.txt

21  $100,000 --

22          A.      Yes.

23          Q.      With a minus sign next to it?

24          A.      Yes.

25          Q.      What does that mean to you?

A


1                       A. Branca                    105

2           A.      It was taken out.

3           Q.      Looking underneath it, do you

4   see "from 578-22807"?

5           A.      Yes.

6           Q.      And that's the number of this

7   account; right?  Upper right-hand corner?

8           A.      Right.

9           Q.      And it says, "to 578-21674."

10  You see that?

11          A.      Okay.

12          Q.      And the date for the $152,000

13  transfer was 01/11/07 and the date of the

14  journal of $100,062 was 01/12/07?

15          A.      Okay.

16          Q.      Now, look with me at

17  Exhibit 7.  Do you have that in front of you?

18                  Looking at the first page.  What

19  is the caption of that account?

20          A.      The FCM Grouping.

21          Q.      And that's your company; isn't

22  it?

23          A.      Correct.

24          Q.      Look at the statement, if you

25  would, dated January 1 through January 31,

                       Page 90

Branca's deposition.txt

A

```
 1                    A. Branca                106
 2   2007.  It's right on top, page six of eight in
 3   the upper right-hand corner.  The upper
 4   right-hand corner is the page number.
 5           A.    All right.
 6           Q.    On the bottom, do you see the
 7   receipt under the caption "deposits" of
 8   $152,900?
 9           A.    Yes.
10           Q.    On 01/16/07?
11           A.    Yes.
12           Q.    And do you see the journal
13   underneath that of $100,062 on 01/12?
14           A.    Yes.
15           Q.    You would agree with me, would
16   you not, that those monies came from the
17   Landmark account that you had created?
18           A.    Correct.
19           Q.    That had been taken from the
20   Prestige account?
21           A.    Correct.
22           Q.    Let's look at Exhibit 8.
23   Do you have that in front of you?
24           A.    Yes.
25           Q.    What is the name of that
```

A

```
 1                    A. Branca                107
 2   account?
```

                          Branca's deposition.txt
3          A.    Branca Family Holdings, LLC.

4          Q.    If you look at the fourth page,

5    what is the date that you opened that account?

6          A.    03/09/07.

7          Q.    Do you have a recollection as to

8    what happened with that FMC account?

9          A.    It probably got transferred into

10   here.

11         Q.    It all got transferred into

12   here, didn't it?

13         A.    It was all my money.  I can

14   transfer it anywhere I want.

15         Q.    Was that $252,000 all your

16   money?

17         A.    Once it was on the sheet, it was

18   all my money.

19         Q.    Do you have the sheet that shows

20   it was all your money?

21         A.    I can reconstruct the sheets.

22         Q.    Do you have the sheet that shows

23   it was all your money?

24         A.    No, Mr. Aronson has all the

25   sheets.

A


1                    A. Branca                 108

2          Q.    Is your answer that you do not

3    have the sheets as a certified public

4    accountant --

5          A.    It has nothing to do with being

6    a certified public accountant.

7          Q.    Do you have the sheets,
                         Page 92

Branca's deposition.txt

 8  Mr. Branca?

 9          A.    No, I don't.

10          Q.    Okay.  And you would agree that

11  all the monies from FMC went into this account?

12          A.    Correct.

13                MR. REIS:  Okay.  I am done with

14          those.  Thank you.

15                MR. GOODRICH:  Did you make

16          duplicate copies of these exhibits for

17          us?

18                MR. REIS:  They were produced to

19          you.

20                MR. GOODRICH:  But you have

21          created exhibits of them now, so I

22          don't know which are --

23                MR. REIS:  I have duplicate

24          copies.

25                MR. GOODRICH:  For me so can

A

 1                  A. Branca                    109

 2          I can have copies of the exhibits?

 3                MR. REIS:  Yes.

 4          Q.    I want to get a status on the

 5  Bear Hill property and the Middle Paten Road.

 6                Is Bear Hill generating any

 7  revenue?

 8          A.    No.

 9          Q.    What is the status of that

10  property?

11          A.    It is in the process of being

Page 93

Branca's deposition.txt

12  subdivided.

13          Q.     Have you taken action since the

14  issuance of the TRO to subdivide that property?

15          A.     I have continued the process of

16  subdividing the property.  The property was

17  being subdivided, the applications were in.

18  It's a question of when they come up in the

19  hearings.

20          Q.     Have you authorized attorneys to

21  proceed further in the subdivision of that

22  property since the date of the TRO?

23          A.     No.

24          Q.     Have attorneys acted on your

25  behalf?

A


1                   A. Branca                    110

2          A.     No.

3          Q.     Have you directed them not to

4  proceed, given the order of the Court in this

5  matter?

6          A.     The attorneys?

7          Q.     Have you directed them not to

8  proceed doing anything further on that property

9  since the issuance of the TRO in this matter?

10         A.     No.

11         Q.     Is there a reason why you have

12  not?

13         A.     Nobody's working, they are not

14  getting paid.  There is no need to.

15         Q.     Are attorneys working on the

16  subdivision of that property?

Branca's deposition.txt

17          A.     No.

18          Q.     Is anything being done with

19   regard to that property?

20          A.     No.

21          Q.     I thought your answer to my

22   question was that people were working on it,

23   that things were happening.  Is it now your

24   testimony that nothing was being done to that

25   property?

A


1                    A. Branca                 111

2          A.     Whatever applications were in

3    place, prior to the TRO, were being followed

4    through the process.

5          Q.     Have you directed the person or

6    entity responsible for that process to stop the

7    process?

8          A.     No.

9          Q.     Is there a reason why you have

10   not?

11         A.     Again, nobody is working because

12   they are not getting paid.

13         Q.     And that's for Bear Hill; right?

14         A.     That is for Bear Hill.

15         Q.     You know, you are aware of the

16   Judge's order in this matter?

17         A.     Correct.  You cannot sell,

18   transfer, encumber, further encumber the

19   property; yes.

20         Q.     Is that your understanding of

Page 95

Branca's deposition.txt

21  what the order was?

22          A.    Yes.

23          Q.    What about Middle Paten Road?

24   What's the status of that?

25          A.    It is in the final stages of

A


1                    A. Branca                  112

2   approval.

3          Q.    Again, similar question; did you

4   direct persons or entities working on that

5   project to cease working on that project?

6          A.    Negative.

7          Q.    When you say "negative," what do

8   you mean?

9          A.    No.

10          Q.    What has transpired since the

11   date of the TRO?

12          A.    We obtained wetland approval,

13   right around December of 2007.

14          Q.    When you say "we," who acted on

15   behalf of the entity?

16          A.    An engineering firm, a wetland

17   consultant and an attorney.

18          Q.    What was your understanding of

19   the TRO?

20          A.    Do not sell, transfer, or

21   encumber properties.

22          Q.    You mentioned that you could

23   recreate the sheets; didn't you?

24          A.    Yes.

25          Q.    What documents do you have that

Branca's deposition.txt

A

```
 1                    A. Branca                 113
 2  would allow you to recreate the sheets?
 3           A.    I have the whole box of checks
 4  that you gave me.  And if I had the checks for
 5  2005 and 2006, it would be a relatively simple
 6  task.
 7           Q.    Do you have the invoices?
 8           A.    Don't need the invoices.
 9           Q.    For the vendors?
10           A.    Mr. Aronson has those, along
11  with the sheets.
12           Q.    Answer my question.  Do you have
13  the invoices of the vendors?
14           A.    No.
15           Q.    The sheets contain information
16  relating to various projects that you and
17  Mr. Aronson were working on; correct?
18           A.    There were two projects that we
19  were working on.
20           Q.    The sheets only deal with the
21  two projects?
22           A.    The sheets relating to money
23  that he spent and money that I spent.  That we
24  have to -- That he owes me or I owe him.
25           Q.    With regard to only two
```

A

```
 1                    A. Branca                 114
 2  projects?
```

Page 97

Branca's deposition.txt

3          A.     At this point in time there are

4    two projects.

5          Q.     At this time point in time.

6    I was talking about the past.

7          A.     Going back twenty years?

8    We have had a sheet for twenty years, yes.

9    Every project that we did was put on that

10   sheet.

11         Q.     You are not answering my

12   question, Mr. Branca.  The sheet that you refer

13   to being able to recreate, what time period are

14   you referring to?

15         A.     From 2006 to present.

16         Q.     What information is contained on

17   those sheets?

18         A.     Money transferred back and

19   forth.

20         Q.     You received copies of the

21   checks that we subpoenaed; correct?

22         A.     Checks that you subpoenaed?

23   I received copies of checks from 2001 through

24   2004.  I believe you subpoenaed up to 2007.

25   You forgot to send us 2005, '06 and '07.

A


1                  A. Branca                    115

2          Q.     You received copies of checks

3    that we subpoenaed; didn't you?

4          A.     2001 through 2004.

5          Q.     What information would you need

6    that you have accessible to complete your

7    spread sheet?  You would have your own

Branca's deposition.txt

8    documents, wouldn't you?  What you paid?

9         A.    I have all of the expenses that

10   were paid out of Windward Holdings; correct.

11        Q.    Did you put any money into May

12   Construction?

13        A.    Back in 1983 or '84, when May

14   Construction was May Industries Corp.; yes,

15   I did.

16        Q.    So if you had all the checks

17   from May Construction, it's your testimony that

18   you could recreate everything?

19        A.    Give or take.  I could come

20   close.  We are talking about a lot of money

21   here.

22        Q.    How would you know about the

23   projects that you referred to May Construction,

24   how would you know the profit and loss on that?

25        A.    I would have to go through the

A

1                   A. Branca              116

2    files.

3         Q.    Do you have those files?

4         A.    I don't have them with me.

5         Q.    But you have those files?

6         A.    I may have access to those

7    files.

8         Q.    Very good.  What files do you

9    have, for which of those entities?

10        A.    I don't have the job files

11   themselves.  I've got job knowledge and

Branca's deposition.txt

12  somewhere around there are job cost reports

13  that are floating around.  Mr. Aronson has.

14  And somewhere on a back-up on a diskette in my

15  office there may be accounting files someplace.

16          Q.    Okay.  That's what you would

17  recreate it with, the documents you may or may

18  not have?

19          A.    That's right.  And your

20  cancelled checks.

21          Q.    Whose checks?

22          A.    The Bank of New York cancelled

23  checks.

24          Q.    Not mine?

25          A.    The ones that you subpoenaed.

A

1                    A. Branca                    117

2          Q.    Are they mine, Mr. Branca?

3          A.    They're in your possession.

4          Q.    Are they May Construction's or

5   mine?

6          A.    They are May Construction's.

7          Q.    Thank you, Mr. Branca.

8                 Did your accounting firm

9   generate financial statements for May

10  Construction?

11          A.    Yes.

12          Q.    Do you have copies of those?

13          A.    No.

14          Q.    Do you have copies of the

15  invoices relating to services performed for May

16  Construction?

Branca's deposition.txt

17          A.    Yes.

18          Q.    And where are those?

19          A.    Provided to you.

20          Q.    What you provided is all that

21  you have?

22          A.    That's it.

23          Q.    How did you keep track of the

24  profits relating to the jobs you referred to

25  May Construction?

A

1                   A. Branca                   118

2          A.    Job costs.

3          Q.    Tell me how you did that.

4          A.    The money that came in from the

5  jobs get posted against the job.  The money

6  that went out would get allocated to the job

7  and the profit was the difference, the delta.

8          Q.    And again, you do or do not have

9  copies of those job costs?

10          A.    I do not have them but I'm going

11  to make it a point to look for them.  Because I

12  have to recreate the sheet and that will put

13  this whole thing to bed.

14          Q.    And when you recreate the sheet,

15  whether or not that's admissible, you are going

16  to have all the source documents?

17          A.    Yes.

18          Q.    Did you prepare financial

19  statements that were submitted to a

20  construction bonding company?

Page 101

Branca's deposition.txt

```
21        A.    Yes.

22        Q.    Were they true and accurate?

23        A.    Yes.

24        Q.    Were they certified?

25        A.    No.

A


 1              A. Branca              119

 2        Q.    Did they need to be?

 3        A.    No.

 4        Q.    What was the arrangement between

 5  you and Mr. Aronson with regard to the purchase

 6  of Bear Hill?

 7        A.    What do you mean?

 8        Q.    What was the arrangement?

 9        A.    We are 50/50 partners.

10        Q.    What monies were used to

11  purchase that?

12        A.    Joint money in May Construction.

13        Q.    A check was drafted from or

14  drawn from May Construction?

15        A.    Yes.

16        Q.    Is there a reason why you didn't

17  draft a check from your own account?

18        A.    And Yuly draft a check from his

19  account?

20        Q.    Is there a reason why you didn't

21  draft it from your account?

22        A.    We were using joint funds.

23        Q.    From May Construction?

24        A.    Yes.

25        Q.    Is that proper, do you believe,
```

Branca's deposition.txt

A

```
 1                     A. Branca                    120
 2   as an accounting practice, to comingle funds of
 3   a person who is not an owner of May
 4   Construction within the account of May
 5   Construction?  Is that a practice that you
 6   believe is proper?
 7           A.    I don't have an opinion on that.
 8           Q.    You don't?  Okay.  Is it
 9   something you have done with other clients of
10   yours where you have taken money that you were
11   entitled to and maintained it in that account?
12           A.    I probably have.  I can't give
13   you the specifics.
14           Q.    Tell me what account your monies
15   were held in?  Was it the May Construction
16   account?
17           A.    Yes.
18           Q.    And was that money reported to
19   banks and vendors as property of May
20   Construction; to the best of your knowledge?
21           A.    Yes.
22           Q.    And was your amount due to you,
23   deducted from that?
24           A.    Asked and answered.
25           Q.    Would you answer it again for
```

A

```
 1                     A. Branca                    121
 2   me?
```

Branca's deposition.txt

3          A.    The monies due to me were owed

4  by Yuly Aronson.  I give you $10, you

5  deposit $10 into May Construction's account,

6  you owe me the money, not May Construction.

7          Q.    You're not answering my

8  question.

9                The monies that were owed to you

10  by Mr. Aronson, were they being held in May

11  Construction?

12          A.    Yes.

13          Q.    Did you reflect that in any of

14  the applications that were submitted to the

15  banks or the bonding companies?

16          A.    I didn't fill out the

17  applications.

18          Q.    Do you know if Mr. Aronson

19  reflected that?

20          A.    I have no idea.

21          Q.    And how was the decision made as

22  to when you would receive the money that was

23  held in the May Construction checking account

24  that belonged to you?

25          A.    It would be based on cash flow.

A

1                A. Branca                  122

2  It was a joint decision, based on when money

3  was needed.

4          Q.    Exhibit 4, Mr. Branca, is the

5  document entitled, "Windward Holdings Amendment

6  to Shareholders Agreement."  Do you recall that

7  agreement?

Branca's deposition.txt

```
  8          A.    Yes.
  9          Q.    And you testified that that was
 10  not your signature of Yuly Aronson?
 11          A.    Correct.
 12          Q.    It's dated June 2005.
 13          A.    Correct.
 14          Q.    Now, the tax returns that you
 15  were ordered to produce show in 2005 that
 16  Windward Holdings paid interest and ordinary
 17  dividends to you, and it says your wife but I
 18  imagine it was you, as the owner of Windward,
 19  of $23,099.
 20          A.    Okay.
 21          Q.    Can you tell me what constituted
 22  that amount?
 23          A.    There were two private mortgages
 24  that were issued through Windward and that was
 25  the interest that was earned from issuing those
  A
```

```
  1                    A. Branca                    123
  2  mortgages.
  3          Q.    And were those paid monthly,
  4  those mortgages?
  5          A.    Yes.
  6          Q.    Did Mr. Aronson receive any
  7  benefit from that interest?
  8          A.    He received it on the sheet.
  9          Q.    Did Windward Holdings issue a
 10  K-1 to Mr. Aronson?
 11          A.    Mr. Aronson never received a
```

Branca's deposition.txt

12    K-1 from Windward Holdings.  He was never an

13    official owner of Windward Holdings.  He was a

14    silent partner.

15         Q.    You have a document that we

16    introduced as Exhibit 4, which is the Amendment

17    to the Shareholders Agreement.

18         A.    Where is the Shareholders

19    Agreement?

20         Q.    Where is the Shareholders

21    Agreement, Mr. Branca?

22         A.    Don't have it.

23         Q.    Is that a document that you

24    would have kept?

25         A.    Yes, I would have kept that.

A


1              A. Branca              124

2         Q.    You don't have it?

3         A.    Don't have it.

4         Q.    Where was Windward Holdings

5    incorporated?

6         A.    Delaware.

7         Q.    Okay.

8         A.    Mr. Aronson never received a K-1

9    from Windward Holdings, to the best of my

10    knowledge.

11         Q.    Is Windward Holdings still an

12    ongoing entity?  It is; isn't it?

13         A.    Yes.

14         Q.    Where are the books and records,

15    the corporate minutes?  Where is all that?

16         A.    It's in my office.

                    Page 106

Branca's deposition.txt

17          Q.    Did you produce that to me?

18          A.    Whatever minutes were there from

19   Windward Holdings were produced.  Whatever

20   books and records were there, tax returns, were

21   produced.

22          Q.    You have corporate minutes?

23          A.    Whatever minutes were done for

24   Windward Holdings were produced to you.

25          Q.    Okay.  Do you know that you

A


1                    A. Branca                    125

2    produced a single piece of paper with regard to

3    corporate minutes for Windward Holdings?

4          A.    Okay.  I am not aware of that

5    but if you say so.

6          Q.    Your 2005 tax return as

7    submitted has an entry that relates to passive

8    loss and you did not redact that.  And on that

9    document it says, "limited loss, not

10   deductible."

11               What does that amount have to do

12   with and what does the notation have to do

13   with?

14          A.    I need to see it.

15               MR. REIS:  I am going to show it

16          to you.  I didn't make a copy but I

17          will when we admit it.

18          A.    I have no idea.

19          Q.    Mr. Branca, is it surprising to

20   you that so many documents that are required in

Branca's deposition.txt
21  this case are missing?

22          A.    It's amazing.

23          Q.    Documents that only you would

24  possess, like the Windward Holdings --

25          A.    No, sir.  Windward Holding

A


1                    A. Branca                126

2  documents were produced to you.

3  May Construction documents that should have

4  been saved, that had e-mails disputing entries

5  on sheets going back to September, 2006, I'm

6  amazed that your client didn't keep those.

7          Q.    Are you amazed that you didn't

8  keep those, Mr. Branca?

9          A.    We had agreed to the number.

10  When we agreed to the number, that chapter was

11  closed, that paper was filed.  He had access to

12  the papers and I moved forward.  He's bringing

13  up 2006 stuff in 2007.  He had the records

14  because he was able to go back to them and

15  reference them back then.  Now a smart guy like

16  that who knows he's going to bring a lawsuit,

17  why wouldn't he have safeguarded those

18  records?

19          Q.    Do you have copies of those

20  e-mails?

21          A.    Yes, I do.

22          Q.    Did you produce them to me?

23          A.    Yes, I did.

24          Q.    Everything that you had was

25  produced?

                    Page 108

Branca's deposition.txt

A

```
 1                    A. Branca                    127
 2          A.    Yes.
 3          Q.    But do you realize how few
 4  documents were produced?
 5          A.    I produced the e-mails that were
 6  there.
 7          Q.    But do you realize how few there
 8  were?
 9          A.    I think the ones I produced to
10  you were right to the point.  It doesn't matter
11  the quantity.
12          Q.    Are there other documents you
13  possess, Mr. Branca?
14          A.    All the documents that I possess
15  were submitted to you.
16          Q.    Okay.  Your 2004 tax return
17  reflected passive loss of $20,705 which you did
18  not redact.  Would you take a look at that and
19  see if that refreshes your recollection as to
20  whether or not that relates to Windward or Bear
21  Hill or Landmark?
22          A.    It's easy.  The letters on the
23  side with the name relate to the letters on the
24  next page, the next line down.  So the $20,000
25  passive loss allowed, "DD," it's windward
```

A

```
 1                    A. Branca                    128
 2  Holdings.
```

Branca's deposition.txt

3          Q.     Did Mr. Aronson also benefit

4   from that or is it your position because he was

5   not listed as a shareholder, he would not

6   benefit from that?

7          A.     He would not have benefited from

8   that.

9          Q.     Why was Mr. Aronson a silent

10  partner, as you said, in Windward?  What was

11  the reason for that?

12         A.     It's a question to ask

13  Mr. Aronson.

14         Q.     You were part of the entity and

15  you are the shareholder?

16         A.     He's your client.

17         Q.     Mr. Branca, could you please

18  answer my question because you will on Monday.

19         A.     Mr. Aronson was a silent partner

20  because he couldn't own a real estate company

21  and his construction company.  The bonding

22  company would not allow it.  So, in order for

23  him to have access to this, he had to be a

24  silent partner.

25         Q.     And what was the reason for you,

A


1                  A. Branca                    129

2   if any, not being a partner in May

3   Construction?

4          A.     I wasn't a partner in May

5   Construction.

6          Q.     You just had a profit interest

7   in those projects that you brought in?

                    Page 110

Branca's deposition.txt

8          A.    Correct.

9          Q.    And you don't have that document

10    that would show the percentage that was agreed

11    upon?

12          A.    No.

13          Q.    And you don't have the document

14    that shows that Jan Wawak was entitled to

15    receive, possibly, a percentage of Landmark.

16    You don't have that document, either?

17          A.    No.

18          (12:30 recess, proceedings resumed

19          1:00 p.m.)

20          Q.    Mr. Branca, who owns the

21    property at 38 Seneca Walk in Ocean Bay Park?

22          A.    It sold.

23          Q.    Who owned that property?

24          A.    Windward Holdings.

25          Q.    Did Mr. Aronson, individually,

A

1                    A. Branca                    130

2    contribute any funds towards the acquisition of

3    that property?

4          A.    No.

5          Q.    Did he, individually, contribute

6    any funds towards the renovation of that

7    property?

8          A.    No.

9          Q.    Did his company, May

10    Construction, contribute any money towards the

11    acquisition of that property?

Branca's deposition.txt

12          A.    I'm not sure.  That property was

13   acquired back in the '80's, so it was a long

14   time ago.

15          Q.    And did his company, May

16   Construction, contribute any money towards the

17   renovation of that property?

18          A.    The answer is going to be no

19   because May Construction wasn't in existence

20   when the property was bought.

21                So the answer to, "Did May

22   Construction contribute any money to the

23   acquisition of Seneca Walk"; the answer is no.

24          Q.    When was the property sold?

25          A.    The property was sold in April.

A


1                    A. Branca                    131

2          Q.    Of what year?

3          A.    This year.

4          Q.    Did Mr. Aronson receive any

5    credit on the sheets with regard to that

6    property?

7          A.    He doesn't own it.

8          Q.    Just answer the question.

9          A.    No.

10         Q.    Did May Construction receive any

11   credit for that?

12         A.    No.

13         Q.    Did you prepare the personal tax

14   returns for Yuly Aronson?

15         A.    Yes.

16         Q.    During what periods?

Page 112

Branca's deposition.txt

17          A.    During the period '92 to
18   present, 2006.
19          Q.    Mr. Branca, in preparing those
20   tax returns, did you take into account the debt
21   that he owed you as you have testified in this
22   deposition?
23          A.    In what way?
24          Q.    Did you take it into account in
25   preparing his tax return?
A

 1                A. Branca                    132
 2          A.    What would be taxable?
 3          Q.    Did you take it into account --
 4          A.    Tell me what would be taxable.
 5          Q.    I am directing you to answer the
 6   question.  Are you not answering the question?
 7          A.    To the extent it had impact on
 8   taxable income, yes.
 9          Q.    Very well.  Did you prepare any
10   financial statements for Mr. Aronson?
11          A.    Yes.
12          Q.    Did you take into account the
13   debt that you testified he owed you in
14   preparation of those financial statements?
15          A.    The financial statements that
16   were a compilation; it's just the information
17   that was given to me by Mr. Aronson.
18          Q.    But you possess a lot of that
19   information yourself; isn't that true?
20          A.    Not true.

Branca's deposition.txt
```
21         Q.    Did you know the assets, what
22  his interests were in May Construction when
23  preparing those financial statements?
24         A.    Did I know what his interests
25  were?
A

 1                   A. Branca                133
 2         Q.    Yes.  Did you know the value of
 3  May Construction at the time that those
 4  financial statements were being prepared?
 5         A.    No.
 6         Q.    You did not.  What information
 7  did you take into consideration when preparing
 8  the financial statements for Mr. Aronson?
 9         A.    The information that was
10  provided to me by Mr. Aronson.
11         Q.    What was that?
12         A.    Whatever was required to prepare
13  that financial statement.
14         Q.    What information is required,
15  Mr. Branca?
16         A.    Retirement account, balances,
17  assets that are owned, value of the assets that
18  are owned.
19         Q.    Did you take into consideration
20  his interest in Bear Hill?
21         A.    I am not sure.
22         Q.    Did you take into account his
23  interest in properties held in the name of
24  Windward Holdings?
25         A.    I'm not sure.
                   Page 114
```

Branca's deposition.txt

A

```
 1                    A. Branca                134
 2          Q.    Did you look at the sheets at
 3  the time that you prepared those financial
 4  statements that you had prepared?
 5          A.    No.
 6          Q.    Do you have any recollection of
 7  what information Mr. Aronson provided to you?
 8          A.    I would give him the format and
 9  he would fill in the numbers.  The personal
10  financial statement is his claim of what things
11  were worth.
12          Q.    I understand what it is.
13  I'm just asking you do know what information he
14  gave you.  And your testimony is he filled out
15  a form?
16          A.    Correct.
17          Q.    Did you provide any of the
18  information to him to fill out that form?
19          A.    I don't believe so.
20          Q.    You have an obligation to retain
21  tax returns as an accountant; correct?
22          A.    Correct.
23          Q.    For how many years?
24          A.    I believe it is five years.
25          Q.    Do you have Mr. Aronson's
```

A

```
 1                    A. Branca                135
 2  personal tax returns?
```

                        Branca's deposition.txt
3          A.    Yes.

4          Q.    Do you have the returns for

5    May Construction?

6          A.    Yes.

7          Q.    Is there a reason why you didn't

8    produce them to me?

9          A.    I did produce them.

10         Q.    No, you didn't.

11         A.    You guys have them.  You

12   produced them to me.

13         Q.    Is there a reason why you did

14   not produce those returns to me.

15              MR. GOODRICH:  Which returns?

16         You asked about two sets of returns.

17              MR. REIS:  Both the individual

18         and May Construction.

19         A.    The individual returns were not

20   produced to Mr. Aronson because he owes me

21   accounting fees.  And if he wants his tax

22   return he can go to the IRS and request it and

23   pay the $25.  As far as May Construction goes,

24   to the best of my belief, we turned over the

25   tax returns that we had.  Mr. Aronson is trying
A


1                   A. Branca                    136

2    to get around paying his accounting bill and I

3    am not going to let him do it.

4          Q.    Your testimony is that you did

5    not provide me with the tax returns for

6    Mr. Aronson, individually; correct?

7          A.    Correct.
                        Page 116

Branca's deposition.txt

8        Q.      And you did not provide me with
9    tax returns for May Construction?
10       A.      I did provide you with May
11   Construction.
12       Q.      What years did you provide me
13   with, that you believe?
14       A.      2006, 2005, 2004.
15       Q.      A.A. Branca and Co. received
16   payments from May Construction; correct?
17       A.      Correct.
18       Q.      Did A.A. Branca and Co. receive
19   a 1099 for that?
20       A.      Yes.
21       Q.      For what years?
22       A.      I don't remember.
23       Q.      Did you prepare a 1099?
24       A.      Yes.
25       Q.      Do you have copy of that 1099?
A

1                A. Branca                    137
2        A.      No.
3        Q.      The payments that you received
4    from Mr. Aronson or from May Construction, did
5    you receive a W-2?
6        A.      No.
7        Q.      1099?
8        A.      No.
9        Q.      K-1?
10       A.      No.
11       Q.      Is there any document other than
Page 117

Branca's deposition.txt

12  the checks that you prepared for May

13  Construction as its independent accountant to

14  evidence how much payment --

15          A.    Repeat the question.

16          Q.    Was there any document that you

17  prepared as the accountant for May Construction

18  to evidence the monies that were received by

19  A.A. Branca and, also, any document that you

20  prepared as the accountant for May Construction

21  to evidence the receipt by you, individually,

22  from May Construction?

23          MR. GOODRICH:  Can you

24          ask one question at a time.

25          Q.    Did you prepare any documents as

A


1                    A. Branca                    138

2  the accountant for May Construction to evidence

3  the receipt of money by you, individually, from

4  May Construction?

5          A.    Me or my accounting firm?

6          Q.    My question was you.

7          A.    I never received monies.

8          Q.    Never received monies from --

9          A.    May Construction.  Personally.

10          Q.    And your accounting firm did;

11  correct?

12          A.    Accounting firm did.

13          Q.    And you prepared a 1099?

14          A.    Correct.

15          Q.    All right.  Let's go over the

16  Answer to this matter.  You reviewed this

Page 118

Branca's deposition.txt

17 Answer before it was submitted?

18          A.    Yes.

19          Q.    You are claiming that

20 Mr. Aronson owes you $136,050; correct?

21          A.    It's probably more now.

22          Q.    But in the Answer, that's what

23 it says.

24          A.    If that's what it says, that's

25 what it says.

A


1                 A. Branca                139

2          Q.    Do you have the invoices to

3 support that contention?

4          A.    Is this for accounting fees?

5 He owes me two ends.  He owes me accounting

6 fees and he owes me development costs.  Was

7 that the accounting fees that are owed?

8          Q.    I'm referring to the accounting

9 fees.

10         A.    Accounting fees; a copy of the

11 invoice with the supporting documents behind

12 them was submitted to you as part of discovery.

13         Q.    Are those the only documents you

14 have to support this contention?

15         A.    Yes.

16         Q.    You are seeking a claim for

17 $48,331 as a first counterclaim, correct?

18 Relating to Middle Paten Road; correct?

19         A.    If that's what it says there.

20         Q.    That's what it says.  Do you

Branca's deposition.txt

21   believe you also provided me with

22   substantiation for that claim?

23         A.    Yes.

24         Q.    And you have nothing else, other

25   than what you have provided to me?

A

1                   A. Branca                140

2         A.    No.

3         Q.    And with regard to your count

4    two, have you provided to me all documentation

5    in support of that claim for $13,303?

6         A.    What is that claim for?

7         Q.    I will let you take a look at

8    the Answer and you can tell me.

9         A.    Yes.  On the sheet, Bear Hill

10   Associates and Middle Paten Road, the

11   development costs are all lumped together.

12   I don't know why we broke them out into two

13   claims.

14         Q.    My question was, did you provide

15   me with all the documentation in support of

16   that claim?

17         A.    Absolutely.

18         Q.    Absolutely?  Thank you.

19         MR. GOODRICH:  I just want to

20         make a note that there were multiple

21         documents provided to you prior to

22         the commencement of the lawsuit, also,

23         when we discussed this; okay?

24         MR. REIS:  Okay.

25         Q.    With regard to your fourth

Branca's deposition.txt

A

```
 1                    A. Branca                 141
 2   counter claim, you have asked the Court to
 3   order that Mr. Aronson deposit $200,000 because
 4   you are continuing to incur, quote unquote,
 5   ongoing and continuing costs and expenses to
 6   develop Middle Paten Road and Bear Hill
 7   property; is that correct?
 8            A.   Correct.
 9            Q.   Now, all expenses should have
10   stopped consistent with the TRO; correct?
11            A.   The TRO said, "do not encumber,
12   transfer or sell the property."  It did not say
13   I couldn't continue to develop the property.
14   So, under the advice of counsel, come
15   January 1st of this year, I stopped paying the
16   bills.  But up until January 1st of 2008,
17   I incurred costs and paid bills.
18            Q.   Have you provided me with the
19   documentation required to substantiate your
20   ongoing and continuing costs that you have
21   incurred?  As you have alleged, rather?
22            A.   I believe -- There were a bunch
23   of documents that were sent.  Just the sheets.
24   And I believe you sent the sheets through
25   courier.
```

A

```
 1                    A. Branca                 142
 2            Q.   When you say "you," who do you
```

Page 121

                       Branca's deposition.txt
 3  mean?
 4              MR. GOODRICH:  He was looking at
 5          me.  I believe it was sent, also,
 6          under separate letter, saying that
 7          there were bills accumulating and we
 8          wanted permission to pay those bills.
 9          Q.    Does Lorraine Pellegrino still
10  work for you?
11          A.    Yes.
12          Q.    Do you know her home address?
13          A.    No.
14          Q.    Do you know what state she lives
15  in?
16          A.    Connecticut.
17          Q.    With regard to Bear Hills, did
18  you consult with Mr. Aronson relating to all
19  actions taken regarding that property?
20          A.    Yes.
21          Q.    Mr. Branca, you produced to me
22  an operating agreement of Bear Hill Associates
23  that only had your signature.  Do you have a
24  fully executed copy?
25          A.    Good question.  I don't know.
A


 1                  A. Branca                143
 2  I would have to see.  If I produced it to you,
 3  then that's what I have.  But I thought it was
 4  fully executed.
 5          Q.    You produced to me a
 6  shareholders agreement for Windward Holdings.
 7          A.    Okay, so you did have it.
                       Page 122

Branca's deposition.txt

8          Q.    Windward Holdings.

9          A.    I understand.  I understand.

10   Back earlier, you asked me if I had it and I

11   said I didn't think that I had it.

12          Q.    I have asked for corporate

13   minutes but --

14          A.    You said why do we have an

15   amendment to the shareholders agreement when we

16   don't have a shareholders agreement.

17                MR. REIS:  I'm sorry, I

18          apologize.  My client produced

19          this because it's marked with a P.

20          Q.    Any reason why you didn't date

21   it?

22          A.    Any reason?  I don't know.

23                MR. GOODRICH:  Could you let him

24          see it?

25          Q.    Do you see a date there?

A

1                     A. Branca                144

2          A.    Did you provide us with a copy

3   of that?

4          Q.    Do you see a date there?

5          A.    No.

6          Q.    Thank you.

7                MR. GOODRICH:  Sure there is a

8          date there.

9          Q.    Next to your signature,

10   Mr. Branca.

11                Mr. Branca, P-174 through P-180

Page 123

Branca's deposition.txt

12   were produced to your attorney.  That's what

13   this document is that we just looked at.

14              MR. GOODRICH:  In that last box

15         that just came?

16              MR. REIS:  No, Mr. Goodrich.

17         Off the record.

18              (Discussion off the record.)

19              (Break taken.)

20         Q.   I just have one more question,

21   Mr. Branca, for today.  I just want to clarify

22   one thing.  38 Seneca Walk was just sold in

23   April?

24         A.   Correct.  2008.

25         Q.   Was that a property that was

A


1                  A. Branca                  145

2    held by Windward Holdings?

3         A.   Yes.

4         Q.   The TRO directed that no

5    properties of Windward Holdings be sold,

6    encumbered or pledged.

7         A.   No, it didn't, sir.

8    It said none of the properties that belonged to

9    Yuly Aronson or that Yuly Aronson claimed an

10   interest in could be sold.

11              If you take out your shareholder

12   agreement, it clearly states that 38 Seneca was

13   not part of that deal.

14              MR. REIS:  I have no further

15         questions for you.  Thank you.

16

Branca's deposition.txt

17                  _____
                    ANTHONY  BRANCA
18

19
    Sworn and subscribed to
20  before me this   day of              2008.

21
    _____
22  Notary Public

23

24

25

A


1                                              146

2                        I N D E X

3  WITNESS:                           PAGE
   ANTHONY BRANCA                       4
4
                        E X H I B I T S
5
   PLAINTIFF'S                         PAGE
6  FOR IDENTIFICATION:

7  1  Branca Letter, 12/16/06.         68

8  2  Branca Letter, 03/09/02.         73

9  3  Vendor Questionnaire, 27 pgs.    80

10 4  Windward Holdings Amendment to   84
      Shareholders Agreement.
11
   5  Copies of Bank of New York checks  90
12    and statements.

13 6  Smith Barney FMS Statements.     101

14 7  Smith Barney FMS Statements.     101

15 8  CitiGroup Smith Barney Statements.  101

16

17

18

19

20

Branca's deposition.txt

21

22

23

24

25

A

1                                                    147

2                        CERTIFICATION

3

STATE OF NEW YORK          )

4                          )      ss.

COUNTY OF WESTCHESTER      )

5

6

7                I, KATHRYN MACDONALD, a

8    Stenographic Reporter and Notary Public of the

9    State of New York, do hereby certify:

10

11               That the witness whose

12   deposition is herein set forth was duly sworn

13   by me; that the within transcript is an

14   accurate record of the testimony given by such

15   witness, to the best of my knowledge and

16   ability.

17

18               That I am not related to any of

19   the parties involved in this matter, and that I

20   have no personal interest whatsoever in the

21   outcome thereof.

22

23               _____

24               Kathryn MacDonald

25

Branca's deposition.txt

A

148

ERRATA PAGE

Pg. Ln.  CORRECT:              TO:

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

_____   _____    _____

A